UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re:                                                      :
                                                            :      Chapter 1
HUDSON 888 OWNER LLC and HUDSON                             :
888 HOLDCO LLC,                                             :      Case No. 24-10021 (MEW)
                                                            :
            Debtors.                                        :      Jointly Administered
------------------------------------------------------------x

**DECISION DENYING MOTION TO DISMISS THE DEBTORS' CHAPTER 11 CASES
OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY**

A P P E A R A N C E S :

HERRICK, FEINSTEIN LLP
New York, New York
*Attorneys for Debtors*
   By: Robert D. Gordon, Esq.
       Nicholas G.O. Veliky, Esq.

REED SMITH LLP
New York, New York
*Attorneys for DOF II-Bloom Senior LLC and DOF
II-Bloom Mezz LLC*
   By: Andrew L. Buck, Esq.
       Louis A. Curcio, Esq.
       Nicholas B. Vislocky, Esq.

**HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE**

      Debtor 888 Owner LLC (the "**Mortgage Debtor**") is a Delaware limited liability company that owns a mixed-use condominium and commercial building at 502 West 45th Street in New York City. Debtor 888 Holdco LLC ("**Holdco**") is the parent company of the Mortgage Debtor. The property owned by the Mortgage Debtor is security for a mortgage loan in the remaining amount of approximately $60 million (the "**Mortgage Loan**"). Holdco is separately obligated under a Mezzanine Loan in the amount of approximately $30 million (the "**Mezzanine Loan**"). The Mezzanine Loan is secured by a pledge of Holdco's membership interests in the

1

Mortgage Debtor. The Lender's rights under Mortgage Loan are currently held by an entity named DOF II-Bloom Senior LLC (the "**Mortgage Lender**"), and the Lender's rights under the Mezzanine Loan are currently held by DOF II-Bloom Mezz LLC. (the "**Mezzanine Lender**" and, collectively with the Mortgage Lender, the "**Lenders**").

The Debtors filed chapter 11 petitions on January 7, 2024. On February 20, 2024, the Lenders filed a motion to dismiss or, in the alternative, for relief from the automatic stay (ECF No. 65). They contend that the bankruptcy filings were not properly authorized under the Debtors' governing LLC agreements and that the filings allegedly were in bad faith under the standards set forth in *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310-12 (2d Cir. 1997). Alternatively, the Lenders ask that I lift the automatic stay to allow the Lenders to enforce their rights as to their collateral and to allow the parties to proceed with a pending state court action in which the Debtors had sought to bar the Lenders from taking control. The Debtors opposed the motion, and I held a hearing on March 14, 2024.

I.    **The Bankruptcy Petitions Were Properly Authorized**

The Lenders contend that on November 17, 2023 a "Third Amended and Restated Limited Liability Company Operating Agreement of Hudson 888 Holdco LLC" (the "**Third Amended LLC Agreement**") was properly released from escrow and thereby took effect. The Lenders contend that as a result the Mezzanine Lender was entitled to exercise control of Holdco and that the bankruptcy filings by Holdco and the Mortgage Debtor required the Mezzanine Lender's written consent, which was not obtained. The Lenders made other arguments about the proprieties of the filings but those were withdrawn at oral argument in light of additional documents that the Debtors filed. The Lenders acknowledged that their challenges to the validity

2

of the filings depends on their contention that the Third Amended LLC Agreement was properly released from escrow and became effective.

The main facts relevant to this issue are not in dispute and are set forth in documents that the parties have submitted to the Court.

1. On September 23, 2023, the parties entered into a Forbearance Agreement. *See* Declaration of Zachary Bennett, ECF No. 67, Ex. F. The agreement was governed by New York law. Forbearance Agreement § 7.09. Holdco agreed, as part of the Forbearance Agreement, to execute a Strict Foreclosure Agreement that would be held in escrow but that could be "released to Lender upon the occurrence of a Termination Event." Forbearance Agreement, § 2.02(a). The Strict Foreclosure Agreement was to provide that, upon the occurrence of a Termination Event, Holdco "irrevocably consents to Mezzanine Lender's retention of [the membership interests in the Mortgage Debtor] in full satisfaction of the Outstanding Indebtedness under the Mezzanine Loan." *Id.* The Forbearance Agreement defined this event as the "Retention of Collateral." *Id.*

2. Section 2.02(b) of the Forbearance Agreement provided that "[a]s a matter of convenience and to facilitate the effectuation of the Retention of Collateral" Holdco was to execute and to deliver, in escrow, various "Conveyance Items" that also would be "released to Lender upon the occurrence of a Termination Event." One such "Conveyance Item" was to be the Third Amended LLC Agreement. Forbearance Agreement, § 2.02(b).

3. The parties also entered into an Escrow Agreement dated September 29, 2023, under which the Lenders' counsel (the Reed Smith firm) agreed to act as escrow agent. *See* Bennett Declaration, Ex. G. The Escrow Agreement was governed by New York law. Escrow Agreement, § 7. The Escrow Agreement referred to the Forbearance Agreement and defined the Strict Foreclosure Documents and the Conveyance Items collectively as the "Escrow Items." *Id.*

at p. 1.  Section 3(a)(iii) provided that if a Termination Event occurred the Mezzanine Lender was entitled to send written notice to Holdco and the Escrow Agent identifying the relevant Termination Event and "stating that Lender is entitled to the Escrow Items."  *Id*. § 3(a)(iii). Holdco was entitled to object within two days to the release of such items, and if it did so the Escrow Agent was obligated to hold the documents until such time as it received either a written direction from the parties or a court order.  *Id.*

        4.        On October 20, 2023, the parties executed an Amendment to the Forebearance Agreement and the Escrow Agreement.  *See* Bennett Declaration, Ex. J.  The amendment provided modified terms for a $4 million interest payment that otherwise had been due on October 20, 2023.  It also confirmed that a failure to make timely payments of certain future amounts, including "the timely payment of the monthly Debt Service due on" November 5, 2023," would constitute a "Material Payment Default" that would be "an automatic Termination Event" provided that notice of such Termination Event was given in accordance with the Forbearance Agreement.  *Id*. § 2(c).  Finally, the parties agreed to amend the second sentence of section 3(a)(iii) of the Escrow Agreement to make clear that that if the Mezzanine Lender sought a release of the Escrow Items "Borrower shall <u>not</u> have the right to object to such request for the Escrow Items in connection with a Termination Event due to any Material Payment Default . . ." *Id.* § 3.

        5.        Lenders contend that a Material Payment Default occurred in November 2023. However, the Mezzanine Lender did *not* ask for the release of all of the escrowed documents and did *not* elect to proceed with the strict foreclosure.  Instead, the Mezzanine Lender notified Holdco of the alleged Termination Event in a letter dated November 17, 2023, and stated that the Mezzanine Lender intended to instruct the Escrow Agent "to release *only* the Conveyance Items

4

from escrow. All other items held in escrow shall remain so held by the Escrow Agent pending further notice from Lender." *See* Barnett Declaration, Ex. L at p.2.

6. The Mezzanine Lender sent a notice to the Escrow Agent on November 17, 2023. *See* Barnett Declaration, Ex. M. The letter referred to the alleged default and to the terms of the amendment to the Escrow Agreement, and then stated the following:

> Accordingly, Lender hereby informs Escrow Agent that it deems the Third Amended and Restated Limited Liability Company Agreement of Hudson 888 Holdco LLC released form escrow as of the date of this letter. A copy of such agreement, which has been dated as of the date of this letter, is attached for your reference.
>
> All Escrow Items (other than the [Third Amended LLC Agreement] are to remain in Escrow Agent's possession until further *[sic]* Lender delivers further instruction or as otherwise provided in the Escrow Agreement.

*Id.* at p.2.

7. The Debtors served notice later that same day that the Debtors objected to the release of documents from escrow.

One matter that is not particularly clear based on the parties' submissions is just how the "escrow" was handled and just what "release" of documents from escrow occurred. It appears from the Mezzanine Lender's notice that the Mezzanine Lender already had a copy of the Third Amended LLC Agreement (in fact it was transmitting a signed copy to the escrow agent) and that the Mezzanine Lender simply "deemed" the agreement to have been released. The Lenders submitted the further Declaration of Michael S. Estreicher on this subject [ECF No. 88] but it just cryptically states the following:

> 4. By letter dated November 17, 2023 (the "Escrow Letter", a copy of which is annexed hereto as <u>Exhibit A)</u>, Lenders notified Escrow Agent that an automatic Termination Event had occurred under the Forbearance Agreement . . . and informed Escrow Agent that Lenders "deem[] the Third Amended and Restated Limited Liability Company

5

>   Agreement of Hudson 888 Holdco LLC released from escrow as of the date of this letter."
>
>   5.   Accordingly, the Third Amended and Restated Limited Liability Company agreement of Hudson 888 Holdco LLC was released from escrow effective immediately upon Escrow Agent's receipt of the Escrow Letter.

*Id.*

It is clear that, under the terms of the Escrow Agreement, no party had the right to "deem" any document to have been released. The Escrow Agreement contemplated that the Escrow Agent needed to take affirmative action to release the Escrow Items. The parties dispute whether Holdco had rights to contest whether a Termination Event had occurred and whether Holdco had rights to object to the release of the Escrow Items. However, even if Holdco had not possessed that right the Escrow Agreement nevertheless empowered the Escrow Agent, in the event it was aware of an objection, to decline to release the Escrow Items. *See* Escrow Agreement §§ 3(c), 17. In other words, some affirmative decision and action had to be taken by the Escrow Agent to "release" documents from escrow. Mr. Estricher's declaration almost studiously avoids describing any actual decision or action made or taken by the escrow agent. Instead, it offers what appears to be a not well-reasoned legal argument about the effect of the Mezzanine Lender's own contention that it "deemed" the release to have occurred.

I would require further evidence on this point and other points if not for another, more fundamental defect in the Lenders' contentions. The parties to the Forbearance Agreement and the Escrow Agreement agreed that if a Termination Event occurred the Mezzanine Lender could proceed with a strict foreclosure, in which it would receive the membership interests in the Mortgage Debtor and in exchange would deem the outstanding Mezzanine Loan to have been fully satisfied. The Third Amended LLC Agreement was a "Conveyance Item" that was meant to "facilitate the effectuation" of the transfer of interests and the cancellation of debt that would

6

occur under the Strict Foreclosure Agreement. *See* Forbearance Agreement, § 2.02(b). There is no provision of the Forbearance Agreement, or the Escrow Agreement, that permits the Lenders to take the Third Amended LLC Agreement out of escrow (and to give themselves purported control rights under that agreement) without also pursuing the strict foreclosure permitted by the Strict Foreclosure Agreement. The Escrow Agreement makes clear that the "Escrow Items" are a package, and the Forbearance Agreement similarly makes clear that the Third Amended LLC Agreement was in escrow for the purpose of facilitating the strict foreclosure.

When pressed at oral argument as to just what the Lenders were attempting to do, their counsel stated that the Lenders wanted to take control of Holdco while preserving their rights to decide whether they wished to pursue the strict foreclosure. That was not an option that the documents contemplated or that a fair reading of the documents would support. The deal that is plainly reflected in the Forbearance Agreement and the Escrow Agreement was that the Mezzanine Lender would have certain rights if it proceeded with a strict foreclosure, but that in doing so the Mezzanine Lender also would agree that the Mezzanine Loan was fully satisfied.[1] There is no provision, in any of the governing documents, that permits the Lender to pick and choose among the escrowed agreements and thereby to give itself some of the benefits of the deal (the right to control Holdco) without also at the same time giving Holdco the benefit of the release of obligations that the Strict Foreclosure Agreement contemplated.

---

[1] Parent entities of the Debtors executed guarantees of some or all of the obligations owed to the Lenders. Conceivably the Lenders thought they might use control of Holdco to block opposition to a UCC foreclosure sale of the membership interests in the Mortgage Debtor, and that such a UCC foreclosure sale might permit the Lenders to acquire the membership interests in the Mortgage Debtor for some amount less than the full balance of the Mezzanine Loan (thereby preserving some part of that loan and preserving a claim against the guarantor(s)). It does not matter if that was the Lenders' motive, however, because the documents did not permit the Lenders to pick and choose from among the escrowed documents and to enforce only one of them in isolation from the others.

7

The Third Amended LLC Agreement contains a legend that states that "[t]he *effectiveness and release* of this Executed Agreement, as delivered in escrow . . . is subject to the terms and conditions of that certain Escrow Agreement and that certain Forbearance Agreement, each dated September 29, 2023." Bennett Declaration, Ex. H (emphasis added). The Escrow Agreement makes clear that "Escrow Items" constitute a package, not a menu from which the Lender was free to pick and choose at its discretion. The Forbearance Agreement similarly makes clear that the Third Amended LLC Agreement was a "Conveyance Item" that was meant to "facilitate" the transfer of membership interests that might occur under the Strict Foreclosure Agreement. The Third Amended LLC Agreement was not a document that was to be released except upon a pursuit of the strict foreclosure remedy that the Lenders had the right to invoke.

The Lenders did not invoke their rights to a strict foreclosure; their November 17 notice to the escrow agent, and the admissions by counsel at oral argument, make that clear. They explicitly instructed the escrow agent *not* to release the Strict Foreclosure Agreement. The Escrow Agreement did not entitle the Lenders to ask for the Third Amended LLC Agreement separately from those other documents, and it did not give the Escrow Agent the authority to release any of the Escrow Items except as a complete package.

Since the effectiveness and release of the Third Amended LLC Agreement was expressly subject to the Forbearance Agreement and the Escrow Agreement, and since no proper instruction was given that could have authorized the release of the Third Amended LLC Agreement from escrow, that agreement never became effective. Lenders acknowledge that if this was the case then the bankruptcy filings were properly authorized.

**II.     These Cases Do Not Warrant Dismissal As "Bad Faith" Filings**

Section 1112(b) of the Bankruptcy Code provides that a court shall convert or dismiss a case for "cause" unless the court determines that the appointment of a trustee or examiner would be in the best interests of creditors and the estate.  11 U.S.C. § 1112(b)(1).  Section 1112 does not list "bad faith" as an enumerated "cause" for dismissal, but courts have widely recognized that a lack of good faith is a proper "cause" for dismissal in order to prevent abuse of the bankruptcy system.  7 COLLIER ON BANKRUPTCY ¶ 1112.07 (16th ed. 2023).  A petition is filed in bad faith if "it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings.  *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir. 1991).  Accordingly, courts in this Circuit have long held that a motion seeking dismissal on grounds of bad faith must show "both objective futility of the reorganization process and subjective bad faith in filing the petition."  *In re Kingston Square Assocs.,* 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997); *see also In re AAGS Holdings, LLC*, 608 B.R. 373, 382-83 (Bankr. S.D.N.Y. 2019); *In re Gen Growth Props.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009).  A bankruptcy court should dismiss a case for want of a good faith filing only after proceeding with "great caution and upon supportable findings both of the objective futility of any possible reorganization and the subjective bad faith of the petition" seeking bankruptcy protection.  *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 848 (E.D.N.Y. 1995 (quoting *Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989)).

I note in this case that the Debtors contend that the property owned by the Mortgage Debtor is worth $120 million.  The Lenders argue that the Debtors have offered no evidence to support this, but the Lenders themselves have filed an expert opinion stating that in his

9

preliminary opinion the property is worth $97 million.  The Lenders admitted during oral argument on March 14 that if (for example) the property were sold for this amount the proceeds would be sufficient to repay all of the debts owed to the Lenders, with a residual available for the owners of the equity in Holdco.  A plan of reorganization can provide for a sale, and I cannot find based on the Lenders' admissions that there is any "objective futility" to the reorganization process.

Nor do I see evidence of "subjective bad faith."  Lenders argue as though any action that interfered with their pursuit of state court remedies was a sign of "bad faith," but that simply is not the case.  There is subjective reasonableness to the Debtors' contention that a reorganization may maximize the value of the relevant property and thereby maximize the recoveries of all parties in interest, including the Lenders.  A UCC foreclosure on LLC membership interests (which usually proceeds with limited notice and without significant opportunity for parties to evaluate the assets owned by the LLC) simply is not the best way to maximize the value of Holdco's membership interests in the Mortgage Debtor.  Nor is a state court foreclosure the best way to maximize the value of the property owned by the Mortgage Debtor.  The Lenders may be entitled to relief to pursue those options if the Debtors do not make significant progress towards some kind of refinancing, sale or other reorganization (more on that below), but so far the Debtors have complied with their obligations under the Code, have sought (with significant opposition from the Lenders) to resume the sale of condominium units, and otherwise have behaved reasonably.

In *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship.)*, 113 F.3d 1304, 1311 (2d Cir. 1997) the Court of Appeals listed factors that may be considered in deciding whether a filing has been made in bad faith.  The factors include:

      (1) the debtor has only one asset;

      (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

      (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

      (4) the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

      (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

      (6) the debtor has little or no cash flow;

      (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

      (8) the debtor has no employees.

However, the factors identified in the *C-TC* decision are not a scorecard from which I am required to tally a "bad faith" figure. Instead, as the Court held in *C-TC,* "a determination of bad faith requires a full examination of all the circumstances of the case." *See also In re Kingston Square Assocs.*, 214 B.R. at 725 ("It is the totality of circumstances, rather than any single factor, that will determine whether good faith exists.")

      Upon considering the totality of the circumstances in this case, I find there is no basis for dismissal on the grounds of "bad faith." Some of the factors listed in *C-TC* (that the debtors have essentially one asset and that the claims of unsecured creditors are small in relation to those of the secured creditors) are present here. However, the Debtor has asserted (without opposition) that it generated significant cash flow in 2022 and 2023, and it seeks to generate additional cash flow from condominium sales (a process to which the Lenders have yet to consent). Three such units have been sold, with my approval, since the filing date, at substantial prices that exceed the "release prices" under the Mortgage. This is not a case where the Debtor is unable to pay

11

operating expenses and taxes. Given the admitted overall value of the property itself, and the number and value of the unsold condominium units, it is subjectively and objectively reasonable for the Debtors to believe that a bankruptcy will facilitate a reorganization that will be a success. *In re JPA No. 111 Co.*, 2022 WL 298428, at *12 (Bankr. S.D.N.Y. Feb. 1, 2022), ("[w]hatever the one-by-one tally of C-TC factors reveals, however, the totality of the record before the Court gives an overwhelming impression of a good-faith effort to use bankruptcy remedies to achieve a superior outcome for all parties in interest – with the possible exception of [the secured lender], which stands to be fully paid . . . on account of its secured debt . . . but which may lose profit it could otherwise achieve if its own foreclosure process allows it to emerge with lower-cost ownership of JPA's valuable assets.")

This is not to say, however, that the Debtors should be free to proceed at their leisure, without a clear plan as to how they intend to reorganize and how or when they will accomplish it. At the first hearing in these cases I asked the Debtors how they intended to proceed (whether they intend to arrange new financing, whether they intend to seek a sale, or whether they have something else in mind). I repeated those questions at oral argument on March 14. The only answer the Debtors have been able to offer is that they are still investigating their options. The Debtors argued that the bankruptcy cases have only been pending for just over two months and that they should be entitled to more time to make decisions. However, this is not a case where the debtors' financial troubles arose suddenly and without warning. The underlying loan defaults have existed for a very long time. Refinancing or sale – the most evident options here – are not particularly complicated matters to investigate. The Debtors have had many months, before and since the bankruptcy filings, to investigate their options. The mere fact that a bankruptcy filing

12

has been made does not entitle them to an indefinite period of time in which to make determinations as to what to do.

I have authority under section 105(d) of the Bankruptcy Code to set a deadline for the submission of a Disclosure Statement and Plan. It appears to me that setting such a deadline may be appropriate in these cases. As I stated at the hearing on March 14, the parties are directed to make further submissions on or before the close of business on Tuesday, March 19, as to whether such a deadline should be set and what a reasonable deadline would be.

### III. The Motion For Relief From the Automatic Stay is Denied.

"Bad faith" may be grounds for relief from the automatic stay as well as grounds for dismissal, and in that regard the standards to be applied in deciding whether "bad faith" exists are essentially the same as those applied in deciding whether dismissal is warranted. *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997); *In re MacInnis*, 235 B.R. 255, 259 (S.D.N.Y. 1998). To the extent that the motion for stay relief rests on assertions that the Debtors have acted in "bad faith," I deny the motion for the reasons stated above.

The Lenders also have asked for relief from the automatic stay "with respect to their collateral." However, for the reasons set forth above it is subjectively and objectively reasonable to believe that there is equity value in the collateral that exceeds the obligations owed to the Lenders – in fact, the Lenders' own valuations show that to be the case – and that the collateral is necessary to an effective reorganization.

Finally, the Lenders have asked for permission to continue to pursue the pending New York State Supreme Court action regarding the issue of whether a Termination Event had occurred. The Lenders sought this permission on the theory that a decision in their favor on the "Termination Event" dispute would mean that the Third Amended LLC Agreement had been

13

properly released from escrow and that Lenders should be entitled to exercise control of Holdco. However, for the reasons stated above the release of the Third Amended LLC Agreement from escrow was invalid for entirely different reasons, and it never took effect. There is therefore no purpose to be served by permitting the New York State litigation to resume.

## Conclusion

For the foregoing reasons, the Lenders' motion to dismiss, or in the alternative for relief from the automatic stay, is denied.

Dated: New York, New York
March 15, 2024

**s/Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge
