> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------- X

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| HUDSON 888 OWNER LLC and | : | Case No. 24-10021 (MEW) |
| HUDSON 888 HOLDCO LLC, | : | |
| | : | (Jointly Administered) |
| Debtors.[1] | : | |
| | : | |

----------------------------------------------------------------- X

### THIRD AMENDED DISCLOSURE STATEMENT FOR THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF HUDSON 888 OWNER LLC AND HUDSON 888 HOLDCO LLC

**HERRICK, FEINSTEIN LLP**
Stephen B. Selbst
Robert D. Gordon
Nicholas G.O. Veliky
Rodger T. Quigley
2 Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500

*Attorneys for the Debtors*

Dated:   September 18, 2024
         New York, New York

---

[1]    The Debtors' principal offices are located at 150 East 52nd Street, Suite 8002, New York, New York 10022. The last four digits of the Federal Tax Id. No. of Hudson 888 Owner LLC are 6993. The last four digits of the Federal Tax Id. No. of Hudson 888 Holdco LLC are 4666.

THE INFORMATION CONTAINED IN THIS THIRD AMENDED DISCLOSURE STATEMENT (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND TOGETHER WITH ALL SCHEDULES AND EXHIBITS HERETO, THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING VOTES, AS NECESSARY, ON THE DEBTORS' THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.

---

**RECOMMENDATION OF THE DEBTORS**

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN AND CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED THEREIN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS.

---

PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL PROVISIONS OF THE PLAN. ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

ALL INFORMATION IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED OR COMPILED BY THE DEBTORS' MANAGEMENT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AS OF THE DATE HEREOF (UNLESS OTHERWISE INDICATED HEREIN) BASED ON INFORMATION FROM THE DEBTORS' EXISTING BOOKS AND RECORDS. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS (E.G., STATEMENTS THAT PREDICT, PROJECT, OR USE FUTURE EVENTS AS EXPECTATIONS OR POSSIBILITIES) OR OTHER INFORMATION SET FORTH HEREIN WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO

**BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING, BUT NOT LIMITED TO, THOSE IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.**

**THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT IS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE.**

**NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS, THE FINANCIAL PROJECTIONS, OR ANY OTHER STATEMENTS OR ANALYSES CONTAINED HEREIN.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**UNLESS OTHERWISE DEFINED HEREIN, CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

## Table of Contents

Page

I. EXECUTIVE SUMMARY ........................................................................................................1

    A.     The Voting Classes ..............................................................................................2

    B.     Claims and Interests under the Plan....................................................................2

II. OVERVIEW OF FEE OWNER'S BUSINESS ......................................................................3

    A.     Fee Owner's Business..........................................................................................3

    B.     The Debtors' Debt Structure................................................................................3

    C.     Events Leading to Chapter 11 .............................................................................4

III. OVERVIEW OF THE DEBTORS' RESTRUCTURING.......................................................6

    A.     Key Events During Chapter 11 Cases..................................................................6

IV. SUMMARY OF PLAN .........................................................................................................9

    A.     Administrative Expenses and Priority Claims ...................................................10

    B.     Classification of Claims and Interests................................................................11

    C.     Treatment of Claims and Interests .....................................................................12

    D.     Means for Implementation..................................................................................17

    E.     Distributions........................................................................................................25

    F.     Procedures for Disputed Claims ........................................................................27

    G.     Executory Contracts and Unexpired Leases ......................................................28

    H.     Conditions Precedent to Confirmation of Plan and Effective Date ....................31

    I.     Effect of Confirmation of Plan ..........................................................................32

    J.     Retention of Jurisdiction.....................................................................................36

    K.     Miscellaneous Provisions....................................................................................38

V. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN .........................42

    A.     General.................................................................................................................42

B.      Consequences of Payment of Allowed Claims Pursuant to Plan Generally..........43

C.      Additional Consequences to Direct or Indirect Equity Holders ...........................44

VI. CERTAIN RISK FACTORS TO BE CONSIDERED ..............................................................44

A.      Certain Bankruptcy-Related Considerations...........................................................44

VII. VOTING PROCEDURES AND REQUIREMENTS .............................................................45

VIII. CONFIRMATION OF PLAN .............................................................................................47

A.      Absolute Priority Rule ............................................................................................48

B.      Best Interest of Creditors Test; Liquidation Analysis............................................48

IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .......49

X. CONCLUSION AND RECOMMENDATION......................................................................50

# I.
## EXECUTIVE SUMMARY

Hudson 888 Owner LLC ("Fee Owner") and Hudson 888 Holdco LLC ("Holdco"), Delaware limited liability companies, as debtors and debtors in possession (the "Debtors") in the above-captioned jointly-administered chapter 11 cases (the "Chapter 11 Cases"), submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the *Third Amended Chapter 11 Plan of Reorganization of Hudson 888 Owner LLC and Hudson 888 Holdco LLC*, dated September 18, 2024 (as may be amended, modified, or supplemented from time to time, and together with all schedules and exhibits thereto, the "Plan").[2] The Plan is filed contemporaneously herewith.

The holder or holders of (1) the Allowed Class 1 Claim (Senior Secured Claim), (2) the Allowed Class 2 Claim (Mezzanine Secured Claim), (3) the Allowed Class 3 Claim (Mezzanine Deficiency Claim), (4) the Allowed Class 4 Claims (General Unsecured Claims), and (5) Allowed Class 5 Interests (Interests) are Impaired and entitled to vote on the Plan.[3] The Plan provides for recoveries to Allowed Claim holders in the form of Cash in accordance with the priorities set forth in the Bankruptcy Code and provides the basis for the expeditious conclusion of the Chapter 11 Cases.

In developing the Plan, the Debtors gave due consideration to various exit alternatives. The Debtors also conducted a careful review of Fee Owner's operations, its prospects as an ongoing business, and estimated recoveries in a liquidation scenario, and concluded that recoveries to the Debtors' creditors will be maximized under the Plan. The Debtors believe that their business and assets have significant going-concern value that would not be realized in a liquidation.

**ACCORDINGLY, THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.**

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which each such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

---

[2]    All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

[3]    As of the Voting Record Date, there was one holder of each of the Class 1 Claim, the Class 2 Claim, and, if any, the Class 3 Claim. If any of these claims is subsequently sold or syndicated to more than one holder, a single agent shall be designated by all such holders to whom any payments due under the Plan shall be made on behalf of all such holders by the applicable Debtor.

A.    **The Voting Classes**

All holders of Allowed Claims and Interests may vote on the Plan unless:

(i)     as of the Voting Creditor Record Date, the outstanding amount of such claimant's Claim is not greater than zero ($0.00);

(ii)    as of the Voting Creditor Record Date, such claimant's Claim has been disallowed, expunged, disqualified, or suspended; or

(iii)   as of the Voting Creditor Record Date, such claimant's Claim is subject to an objection or request for estimation, in accordance with the procedures set forth below.

Any creditor that is not scheduled in the Debtors' Schedules (as defined below) as the holder of an undisputed, non-contingent, and liquidated claim and that did not file a proof of claim prior to the Voting Creditor Record Date is not entitled to vote on the Plan.

B.    **Claims and Interests under the Plan**

The following table summarizes: (i) the classification of Claims and Interests under the Plan; (ii) the Classes that are impaired by the Plan; and (iii) the Classes that are entitled to vote on the Plan. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article IV — Summary of Plan below.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Senior Secured Claim | Impaired | Yes |
| 2 | Mezzanine Secured Claim | Impaired | Yes |
| 3 | Mezzanine Deficiency Claim | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Interests | Impaired | Yes |

THE PLAN PROVIDES THAT THE RELEASED PARTIES SHALL BE DEEMED RELEASED AND DISCHARGED FROM ANY CLAIMS TO THE MAXIMUM EXTENT PERMITTED BY LAW.

**II.**
**OVERVIEW OF FEE OWNER'S BUSINESS**

**A.**    **Fee Owner's Business**

Fee Owner owns a mixed-use real estate project commonly known as the Bloom on Forty-Fifth Condominium, located at 500 West 45th Street (the "Project"), on which construction was completed in 2020 and consists of 92 studio, one-bedroom, two-bedroom, and three-bedroom residential condominium apartments (the "Residential Units") and five commercial condominium units (the "Retail Units"). Holdco is a Delaware limited liability company, with XIN Manhattan Holding LLC as its sole member. Holdco's sole asset is the membership interests it holds in Fee Owner.

The offering plan for the sale of the condominium units at the Bloom on Forty-Fifth Condominium was declared effective by the New York Attorney General's Office in 2021, and the first sales of the residential condominium units closed in 2022. As of January 7, 2024 (the "Petition Date"), Fee Owner owned 60 residential condominium units and all five commercial condominium units. Since the Petition Date, Fee Owner has closed the sale of eight Residential Units. The remaining unsold Residential Units are currently for sale. Neither Fee Owner nor Holdco has any employees. Rather, the Project is managed by FirstService Residential Management (the "Manager"), and the Manager's employees provide day-to-day services for residents and tenants of the Project.

**B.**    **The Debtors' Debt Structure**

Together, the Debtors are indebted to DOF II-Bloom Senior LLC ("Mortgage Debt Holder") and DOF II-Bloom Mezz LLC ("Mezz Debt Holder" and together with Mortgage Debt Holder, the "Secured Creditors") for approximately $79.7 million in outstanding principal as of November 30, 2023 according to the Debtors' books and records.[4] Secured Creditors purchased the debt in April 2023 from the original lenders, Dreg Cared Lender LLC and CG45 Funding LLC, respectively, (together, the "Original Lenders"). Secured Creditors are affiliates of BH3 Management, LLC ("BH3"). The debt structure consists of a senior loan (the "Senior Loan") under which Fee Owner is the borrower, secured by a mortgage on the Project and a security interest in the rents and other revenues of the Project. The Senior Loan is held by Mortgage Debt Holder. According to the Debtors' books and records, the outstanding principal amount of the Senior Loan was approximately $58.9 million as of November 30, 2023. The debt structure also includes a mezzanine loan (the "Mezz Loan," and together with the Senior Loan, the "Loans") under which Holdco is the borrower, secured by a pledge of Holdco's equity interests in Fee Owner. The Mezz

---

[4]    As discussed in more detail below in paragraph III.A.8, on April 12, 2024, Mortgage Debt Holder filed a proof of claim asserting total claims as of that date in the amount of $70,644,574, and Mezz Debt Holder filed a proof of claim asserting total claims as of that date in the amount of $35,641,086. On April 30, 2024, the Debtors filed an Objection to each proof of claim, and a preliminary hearing was held on May 31, 2024. The Secured Creditor claims remain subject to final reconciliation as of the Confirmation Date in accordance with the Court's directions at the May 31, 2024 hearing and any further directions and rulings of the Court.

3

Loan is held by Mezz Debt Holder. According to the Debtors' books and records, the outstanding principal amount of the Mezz Loan was approximately $20.8 million as of November 30, 2023.

**C.    Events Leading to Chapter 11**

Construction of the Project was completed in 2020, and condominium sales efforts began in early 2021—in the midst of the Covid pandemic. As a result of the pandemic restrictions in place for more than two years, residential sales of the Project did not meet the projections of the Debtors and the Original Lenders. When pandemic restrictions started to ease in 2022, the Federal Reserve began successive interest rate hikes to combat inflation, with rates increasing from a range of 0.25% to 0.50% in March 2022 to a range of 5.25% to 5.50% in July 2023. Those increases in interest rates caused mortgage rates to increase, which put downward pressure on the condominium sales market. Due to these market forces that were beyond the Debtors' control, the Debtors started defaulting on payments under the Loans on November 5, 2022. As a result, the Debtors and Original Lenders entered into restructuring discussions. In April 2023, while restructuring discussions were ongoing, the Senior Loan was sold to Mortgage Debt Holder and the Mezz Loan was sold to Mezz Debt Holder. Accordingly, while the Senior Loan and the Mezz Loan were previously held by two unaffiliated lenders, following this sale, both the Senior Loan and Mezz Loan were held by affiliates of BH3.

Almost immediately upon purchasing the Loans, the Secured Creditors took aggressive action against the Debtors. On May 11, 2023, less than a month after purchasing the Loans, the Secured Creditors delivered to the Debtors a notice of default and acceleration of the Senior Loan and Mezz Loan. As a result, on June 17, 2023, Fee Owner submitted an 8th amendment of the Project's Offering Plan (the "8th Amendment") to the New York Attorney General's office (the "NYAG"), disclosing that Fee Owner was in arrears on its financial obligations. Because of this, the NYAG would not approve the 8th Amendment, thus precluding Fee Owner from continuing to offer the Residential Units for sale until Fee Owner was current on its financial obligations – thus impairing a primary source of Fee Owner's revenue and damaging the going-concern value of Fee Owner's business. Throughout the summer of 2023, the Debtors presented multiple settlement proposals to the Secured Creditors to pay off the existing Loan balance inclusive of non-default rate interest, which the Secured Creditors rejected—thus extending Fee Owner's regulatory inability to offer the Residential Units for sale. On August 4, 2023, Mezz Debt Holder delivered to Holdco a notice of UCC foreclosure in which Mezz Debt Holder notified Holdco that it intended to sell the limited liability company interests of Holdco in Fee Owner at a foreclosure auction scheduled on October 11, 2023. After numerous attempts at reaching a settlement, the parties entered into a Forbearance Agreement as of September 29, 2023. The terms of the Forbearance Agreement were onerous and included, inter alia: (i) paying restructuring fees in the amount of $297,373.54 to Mortgage Debt Holder and $105,104.76 to Mezz Debt Holder; (ii) agreeing to a strict foreclosure with no right of redemption in the event there was a Termination Event under the Forbearance Agreement; (iii) interest continuing to accrue at the Default Rate; and (iv) no extension of the maturity date.

The Debtors entered into the Forbearance Agreement in order to have an opportunity to refinance the Senior Loan and Mezz Loan in full, but they did not receive any forgiveness of interest or principal or any extension of the maturity date, which was February 5, 2024. After making payments to the Secured Creditors in the amount of $6 million on October 10, 2023, the

Debtors were unable to make the full $4 million payment required under the Forbearance Agreement on October 20 due to regulatory restrictions and limitations on cross-border transfers of funds outside of China at that time—not due to the Debtors' lack of funds. Accordingly, the parties entered into an amendment to the Forbearance Agreement and Escrow Agreement as of October 20, 2023. Under the amendment, the Debtors paid to the Secured Creditors $1 million on October 20, 2023, $250,000 of which was deemed a "restructuring fee" which did not reduce Debtors' indebtedness. The Debtors paid the remaining $3 million a week later on October 27, 2023.

The Debtors were required to make another payment in the amount of $1.9 million as on November 6, 2023. On November 3, the Debtors contacted the Secured Creditors to: (i) request that Lenders roll over any shortfall in the payment required on November 6, 2023 to the succeeding payment date on November 24, 2023; and (ii) confirm the provision in the Forbearance Agreement which gives the Debtors a 30-day cure period for the November 6 payment. The Secured Creditors did not agree with the Debtors' requests. The Debtors then asked the Secured Creditors to agree to a reasonable amendment to the Forbearance Agreement that would, among other things, extend the time for making the November 6 payment and extend the maturity date. In response, on November 13, 2023, the Secured Creditors asked for fees that aggregated in excess of $4 million in exchange for a nine-day deferral on the November 6 payment – and no other relief.

On November 17, 2023, the Debtors received a Notice of Occurrence of Termination Event Under Forbearance Agreement, in which the Secured Creditors alleged that a Termination Event had occurred due to a purported "Material Payment Default" relating to the November 6 payment. As a result of this alleged Termination Event, the Secured Creditors claimed to have the right to: (i) commence and enforce a UCC Disposition; and (ii) cause the release from Escrow of Conveyance Items, one of which would permit an affiliate of Mezz Debt Holder to be appointed as the manager of Holdco. On November 22, 2023, the Debtors commenced litigation against the Secured Creditors in a case styled *Hudson 888 Owner LLC and Hudson 888 Holdco LLC v. DOF II-Bloom Senior LLC, DOF II-Bloom Mezz LLC, and Reed Smith LLP*, Index No. 161355/2023 (Sup. Ct. N.Y. Cnty.), seeking a judgment declaring that a 30-day cure period exists under the Forbearance Agreement with respect to the $1.9 million payment that was due on November 6, 2023. Following commencement of the litigation, the Court granted the Debtors' motion for a temporary restraining order and set a hearing on the Debtors' preliminary injunction motion for January 8, 2024. Thereafter, leading up to the scheduled hearing on January 8, 2024, the Debtors attempted to reach a settlement with the Secured Creditors, but were unsuccessful.

In sum, adverse market forces, described above, led to slowed sales of the Project's Residential Units, which caused the Debtors to default on the Loans. And the NYAG's suspension of sales of the Residential Units during the last 7 months of 2023 severely exacerbated the Debtors' liquidity challenges, resulting in the Debtors having a bona fide need to effect a financial restructuring.

The Debtors are optimistic that the negative financial impacts of the Covid pandemic and high interest rates are beginning to subside. Indeed, the inventory of residential condominium units in the market occupied by the Project is limited, and interest in the remaining unsold residential units in the Project is brisk, even during these Chapter 11 Cases.

# III.
# OVERVIEW OF THE DEBTORS' RESTRUCTURING

## A.   Key Events During Chapter 11 Cases

### 1.   *Chapter 11 Petition*

On January 7, 2024, the Debtors filed voluntary Chapter 11 bankruptcy petitions. The Debtors cases have been jointly administered by order dated January 8, 2024. On February 21, 2024, the Secured Creditors moved to dismiss the Debtors' bankruptcy cases. On March 15, 2024, the Court denied the motion to dismiss.

### 2.   *Cash Collateral Agreement Negotiations*

On January 7, 2024, the Debtors filed a motion (the "Cash Collateral Motion") to authorize the use of cash collateral. After the Cash Collateral Motion was filed and an interim order authorizing the use of cash collateral was entered by the Court, the Debtors entered negotiations with the Secured Creditors concerning a final order on the Cash Collateral Motion. The Debtors and the Secured Creditors agreed to the terms of a final order authorizing the use of cash collateral, which was entered by the Court on March 27, 2024.

### 3.   *The Motion for Authority to Sell Residential Units and the Emergency Motion to Sell Individual Units*

On January 17, 2024, the New York Attorney General approved the 8th Amendment to Fee Owner's Offering Plan, providing regulatory approval for Fee Owner to resume sales of the unsold Residential Units. Accordingly, on January 24, 2024, the Debtors filed a motion to authorize the resumption of sales of Residential Units (the "Sales Motion"). On January 30, 2024, the Secured Creditors filed an objection to the Sales Motion. On January 31, 2024, the Court held a hearing on the Sales Motion, and the Debtors and the Secured Creditors were instructed to negotiate a consensual process by which the Debtors could resume sales of the Project's unsold Residential Units (the "Sales Process").

As the Debtors and the Secured Creditors continued their negotiations regarding the Sales Process, on February 6, 2024, the Debtors and the Secured Creditors agreed to a stipulated order authorizing the sale of the Project's unit 723, which was entered by the Court on February 6, 2024. On March 5, 2024, after the Secured Creditors refused to consent to the sale of the Project's unit 329 ("Unit 329") and unit 801 ("Unit 801"), the Debtors filed an emergency motion to sell those two condominium units (the "Emergency Sales Motion"). The Court granted the Emergency Sales Motion on March 14, 2014.

Subsequently, the Debtors and the Secured Creditors agreed to a Sales Process and submitted to the Court a proposed order on the Sales Motion detailing the same. This Sales Motion order was entered by the Court on March 27, 2024.

4.      *The Debtors' Schedules and Statement of Financial Affairs*

On February 5, 2024, the Debtors filed their schedules of assets and liabilities and statement of financial affairs (the "Schedules"), reflecting secured debt in the amount of $58.9 million and unsecured debt in the amount of $20.8.

5.      *The Section 341 Meeting of Creditors*

On February 15, 2024, the Debtors' meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was conducted by counsel for the U.S. Trustee. The U.S. Trustee's counsel interviewed Sheng Zhang, the Debtors' chairman and chief executive officer, and parties in interest were provided an opportunity to ask questions of the Debtors.

6.      *The Single Asset Real Estate Designation Motion*

On February 16, 2024, the Secured Creditors filed a motion to designate Fee Owner and Holdco as single asset real estate cases (the "SARE Motion"). On March 15, 2024, the court granted the SARE Motion to designate Fee Owner's case as a single asset real estate case (which Fee Owner did not contest) but denied the SARE Motion to designate Holdco's case as a single asset real estate case.

7.      *The April 25 Plan*

On March 21, 2024, the Court entered an Order [Docket No. 110], establishing April 12, 2024, as the deadline by which the Debtors were required to file a proposed plan of reorganization. On April 12, 2024, the Debtors filed their proposed *Chapter 11 Plan of Reorganization of Hudson 888 Owner LLC and Hudson 888 Holdco LLC* [Docket No. 125], along with the corresponding *Disclosure Statement for Chapter 11 Plan of Reorganization of Hudson 888 Owner LLC and Hudson 888 Holdco LLC* [Docket No. 124]. On April 25, 2024, the Debtors filed an amended *Chapter 11 Plan of Reorganization of Hudson 888 Owner LLC and Hudson 888 Holdco LLC* [Docket No. 135] (the "April 25 Plan"), incorporating limited amendments pursuant to certain comments received from the Court at a status conference held on April 25, 2024, as well as certain ministerial edits, and a corresponding amended *Disclosure Statement for Chapter 11 Plan of Reorganization of Hudson 888 Owner LLC and Hudson 888 Holdco LLC* [Docket No. 134]. Under the April 25 Plan, the Debtors proposed, among other things, to re-finance and pay in full the allowed secured claims of the Secured Creditors and to pay general unsecured claims in full, without interest, in two installments (50% on the Effective Date and 50% within five months thereafter). Under this Third Amended Plan, as discussed below, the Debtors still propose to pay the Secured Creditors' allowed claims in full (albeit by different means) and to pay general unsecured claims in the same manner as under the April 25 Plan – in full, without interest, via two installments of 50% each.

8.      *The Secured Creditors' Claims*

On April 12, 2024, Mortgage Debt Holder filed a proof of claim against Fee Owner in which it asserted a secured claim in the total amount of $70,644,574, consisting of $63,938,032 attributable to the prepetition period and $6,706,542 attributable to the postpetition period. Also on April 12, 2024, Mezz Debt Holder filed a proof of claim against Holdco in which it asserted a

secured claim in the total amount of $35,641,086, consisting of $30,933,283 attributable to the prepetition period and $4,707,803 attributable to the postpetition period. Following the filing of the Secured Creditors' proofs of claims, the Secured Creditors informally revised the amounts of their claims, including the reclassification of certain late fees as having been incurred prepetition, rather than postpetition. These revisions had the effect of decreasing the Mortgage Debt Holder's claim to $69,539,074, consisting of $66,572,021 attributable to the prepetition period and $2,967,053 attributable to the postpetition period. With regard to the claim of the Mezz Debt Holder, the Secured Creditors' revisions had the effect of increasing the Mezz Debt Holder's claim as of the Bar Date to $37,091,156, consisting of $32,383,353 attributable to the prepetition period and $4,707,803 attributable to the postpetition period.

On April 30, 2024, the Debtors filed an Objection to the Secured Creditors' proofs of claim. On May 31, 2024, the Court held a preliminary hearing on the matter. The Secured Creditors' claims remain subject to final reconciliation as of the Confirmation Date in accordance with the Court's directions at the May 31, 2024, hearing and any further directions and rulings of the Court.

9.      *The First Amended and Second Amended Plans*

On June 18, 2024, the Debtors filed an Amended Plan, for reasons stated in a letter to the Court dated June 18, 2024 (Docket No. 198), which still proposed payment in full of the Secured Creditors' claims (and maintained the treatment of holders of General Unsecured Claims), but in the first instance proposed payment of the Secured Creditors by means of funding a cash flow reserve, a $10 million paydown of the Senior Secured Claim by October 31, 2024, application of net proceeds of unit sales and rental income to the secured debt over a 20-month Residential Unit sellout period, and a balloon payment at the end of that period. The plan also reserved the right for the Debtors to toggle to a full payment of the secured debt post-confirmation via a refinancing of the Project. On June 28, 2024, the Malaysia Sale referenced in the Second Amended Plan closed, generating equity to fund the plan in the near term. This event was reported to the Court during a status conference on June 28, 2024. As a result of this transaction, and as reported by the Debtors at the June 28, 2024 status conference, the Debtors filed a Second Amended Plan on July 1, 2024, to, among other things, clarify the application of the Malaysia Sale proceeds as part of a secured debt paydown following the Effective Date, as well as certain adjustments to the sellout period and milestones for payment of the Secured Creditors' claims, based on feedback provided by the Court and the Secured Creditors at an earlier June 20, 2024 status conference and input provided by the Debtors' newly-retained expert in connection with the Second Amended Plan.

10.     *The July 2, 2024 Scheduled Confirmation Hearing*

The hearing to consider confirmation of the Second Amended Plan was scheduled to proceed on July 2, 2024. However, prior to the hearing, the Debtors and the Secured Creditors reached a tentative settlement of their disputes and agreed to adjourn the confirmation hearing pending the parties' settlement negotiations, with the Debtors' 180-day exclusivity period under Bankruptcy Code section 1121(c)(3) extended through such adjourned confirmation hearing date.

11.    *Settlement Negotiations Between the Debtors and Secured Creditors Resulting in a Consensual Third Amended Plan*

Following the adjournment of the July 2, 2024 confirmation hearing, the Debtors and the Secured Creditors engaged in good-faith arm's-length negotiations to resolve their disputes, resulting in this Third Amended Plan, which is being filed by the Debtors with the consent and support of the Secured Creditors. For the absence of doubt, while the parties have agreed to the substantive provisions of the Third Amended Plan, the Secured Creditors do not necessarily and should not be deemed to agree with or concede any of the factual allegations by the Debtors in this Disclosure Statement or the Plan.

12.    *Retention of Professionals*

To administer the Chapter 11 Cases, the Debtors retained: (1) Herrick, Feinstein LLP as restructuring counsel; and (2) Holland & Knight LLP as special condominium counsel.

| Retained Professionals | |
| --- | --- |
| Counsel to the Debtors:<br><br>Herrick, Feinstein LLP<br>2 Park Avenue<br>New York, NY 10016<br>Attn:   Robert D. Gordon<br>         Nicholas G.O. Veliky<br>         Rodger T. Quigley<br>Telephone: (212) 592-1400<br>Facsimile: (212) 592-1500<br>Email: rgordon@herrick.com<br>         nveliky@herrick.com<br>         rquigley@herrick.com | Special Condominium Counsel to the Debtors:<br><br>Holland & Knight LLC<br>31 West 52nd Street<br>New York, NY 10019<br>Attn:   Stuart M. Saft<br>Telephone: (212) 513-3308<br>Email: stuart.saft@hklaw.com |

**IV.**
**SUMMARY OF PLAN**

This section of the Disclosure Statement summarizes the Plan, which is filed contemporaneously herewith. This summary is qualified in its entirety by reference to the Plan.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the Plan, and contains other provisions necessary to implement the Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

9

Statements as to the rationale underlying the treatment of claims and equity interests under the Plan are not intended to and will not waive, compromise, or limit any rights, claims, or causes of action in the event the Plan is not confirmed.

## A.    **Administrative Expenses and Priority Claims**

1.    *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim), shall receive in full and final satisfaction, settlement, and release of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of: (a) the Effective Date; and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. As set forth in section 12.1 of the Plan, any outstanding U.S. Trustee fees accruing postpetition prior to the Effective Date shall be paid from Fee Owner's Cash Management Account by the Secured Creditors or their designee. Any U.S. Trustee fees accruing on or after the Effective Date (including any such fees on account of any distributions under the Plan on and after the Effective Date) until the closing of the Chapter 11 Cases shall be paid by the Debtors or the Third-Party Payors. All Allowed Administrative Claims and Allowed Fee Claims shall be paid by the Third-Party Payors as part of the Affiliate Capital Contribution; provided, however, that any unpaid operating expenses of the Project accrued prior to the Effective Date but unpaid as of the Effective Date shall be paid from the Cash Management Account.

2.    *Fee Claims.*

(a)    All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtors and the U.S. Trustee on or before the date that is forty-five (45) calendar days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date. Objections to Fee Claims must be filed and served on counsel to the Debtors, the U.S. Trustee, and the requesting party and its counsel, if any, no later than twenty-one (21) calendar days after the filing of the final application for allowance and payment of a Fee Claim (unless otherwise agreed by the Debtors and the party requesting compensation of a Fee Claim, or as approved by the Court).

(b)    Allowed Fee Claims shall be paid in full, in Cash, by the Third-Party Payors, in such amounts as are Allowed by the Bankruptcy Court: (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Third-Party Payors. For the absence of doubt, this provision does not apply to the fees paid to Holland & Knight in connection with the negotiation and closing of sales of residential condominiums, which fees are paid at closing without need for further application to the Bankruptcy Court, pursuant to that certain Order of the Bankruptcy Court entered at Docket No. 133, unless such fees are otherwise required to be reviewed by the Bankruptcy Court under said order.

(c)    The Debtors and Third-Party Payors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date, including for

services rendered or expenses incurred by the Debtors' professionals, as applicable, in the ordinary course and without the need for Bankruptcy Court approval.

   3.  *Priority Tax Claims.*

   Each holder of an allowed Priority Tax Claim (if any) shall receive equal quarterly payments until January 2029 consistent with Bankruptcy Code section 1129(a)(9), with interest at the rate determined under applicable nonbankruptcy law as provided under section 511(a) of the Bankruptcy Code.

   As of the date hereof, no Priority Tax Claim has been filed in the Chapter 11 Cases, and the deadline for governmental entities to file claims passed on July 5, 2024.

## B.  <u>Classification of Claims and Interests</u>

   1.  *Classification in General.*

   A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under Bankruptcy Code sections 1122 and 1123(a)(1); <u>provided</u>, <u>however</u>, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Confirmation Date.

   2.  *Summary of Classification.*

   The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are: (a) Impaired or Unimpaired by the Plan; and (b) entitled to vote to accept or reject the Plan in accordance with Bankruptcy Code section 1126 or, alternatively, not entitled to vote and automatically deemed to accept or reject the Plan pursuant to the Bankruptcy Code.[5]

| Class | Designation | Treatment | Entitled to Vote |
|:---:|---|:---:|:---:|
| 1 | Senior Secured Claim | Impaired | Yes |
| 2 | Mezzanine Secured Claim | Impaired | Yes |
| 3 | Mezzanine Deficiency Claim | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Interests | Impaired | Yes |

---

[5] As of the Voting Record Date, there was one holder of the Class 1 Claim and one holder of the Class 2 Claim and, if any, the Class 3 Claim. If any of these claims is subsequently sold or syndicated to more than one holder, a single agent shall be designated by all such holders to whom any payments due under the Plan shall be made on behalf of all such holders by the applicable Debtor.

3.    *Elimination of Vacant Classes.*

Any Class of Claims against the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies Bankruptcy Code section 1129(a)(8).

4.    *Voting Classes; Presumed Acceptance by Classes Failing to Vote.*

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

5.    *Confirmation Pursuant to Bankruptcy Code Sections 1129(a)(10) and 1129(b).*

The Debtors shall seek confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to any Class of Claims or Interests that rejects or is deemed to reject the Plan. The Debtors reserve the right to modify the Plan to the extent, if any, that confirmation pursuant to Bankruptcy Code section 1129(b) requires modification.

C.    **Treatment of Claims and Interests**

1.    *Treatment in General.*

Each holder of an Allowed Claim shall receive under the Plan the treatment described in this Article IV in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim, except to the extent different treatment is agreed to by the Debtors and the applicable holder of such Allowed Claim.

2.    *Class 1: Senior Secured Claims.*

(a)    *Classification.* Class 1 consists of Senior Secured Claims.

(b)    *Allowance.* Solely as part of and pursuant to the settlement of all disputes between the Debtors and the Secured Creditors as reflected in this consensual Plan, the Senior Secured Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $60,000,000, inclusive of all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Senior Loan. The Mortgage Debt Holder shall not be required to file amended or supplemental proofs of Claim on account of Senior Secured Claims. For the avoidance of doubt, if the Plan is not confirmed or the Effective Date does not occur, the amount of the Allowed Senior Secured Claims shall be subject to further proceedings and determination by the Bankruptcy Court or agreement of Fee Owner and Mortgage Debt Holder.

(c)    *Treatment.*

(i)     On the Effective Date, Fee Owner shall effectuate the Residential Unit Transfer by delivering the Residential Unit Transfer Documents and shall deliver the Residential Unit Transfer Ancillary Documents in accordance with section 5.1(b) of the Plan.

(ii)    Upon the Residential Unit Transfer, (A) the Senior Secured Claims are partially satisfied and, notwithstanding the Senior Loan Structuring Transaction, the amount owed by the Debtors or Guarantors with respect to the Senior Secured Claims (including, without limitation, Substitute Senior Note B) shall not exceed the Balance of Payoff Amount, and (B) holders of Senior Secured Claims shall retain such interests in the Senior Loan as modified pursuant to the Senior Loan Structuring Transaction set forth in section 5.1 of the Plan, including receiving (1) Substitute Senior Note A in the amount of $14,000,000, and Substitute Senior Mortgage A, securing a maximum indebtedness of $14,0000,000 and encumbering the Residential Units (but not the Retail Units); and (2) Substitute Senior Note B in the amount of $46,000,000 and Substitute Senior Mortgage B, securing a maximum indebtedness of $46,000,000 and encumbering the Retail Units (but not the Residential Units); provided that upon the Residential Unit Transfer, the Debtors and Guarantors shall be deemed, and shall be, released from any and all obligations under the Substitute Senior Note A and Substitute Senior Mortgage A, any guaranty of such obligations, and any and all obligations on account of the Residential Units under the Loan Documents and Senior Loan Structuring Documents, and New Bloom Residential Holdco shall be deemed to have, and shall have, assumed all debts and obligations under Substitute Senior Note A and Substitute Senior Mortgage A;

(iii)   On the Effective Date, the Escrowed Retail Transfer Documents shall be deposited with and held in escrow by Escrowee subject to payment by the Debtors or their designee of the Balance of Payoff Amount within the Retail Closing Period;

(iv)    During the Retail Closing Period, no interest (default or non-default rate) shall accrue on the Senior Secured Claim;

(v)     Upon the

        (a)     payment in cash in full of the Balance of Payoff Amount, (1) all remaining Senior Secured Claims, including, without limitation, any and all obligations due under Substitute Senior Note B and Substitute Senior Mortgage B, are fully satisfied and discharged, and (2) any liens or encumbrances created or filed by or on behalf of any Secured Creditor upon or against the Retail Units, and any debts or obligations of the Debtors and Guarantors

13

under the Loan Documents and Senior Loan Structuring Documents, including, without limitation, Substitute Senior Note B and Substitute Senior Mortgage B, shall be released, discharged, terminated, and removed, and Escrowee shall release the Escrowed Retail Transfer Documents to the Debtors or their designee;

(b)    Debtors' failure to pay the Balance of Payoff Amount by the end of the Retail Closing Period, (1) the Escrowed Retail Transfer Documents shall be released by Escrowee to New Bloom Retail Holdco, and dated as of the first day after the expiration of the Retail Closing Period, and (2) Fee Owner shall execute and/or deliver (A) New York City and New York State transfer tax forms necessary for the transfer of the Retail Units to New Bloom Retail Holdco pursuant to the Plan and (B) Fee Owner's organizational documents, consents or resolutions, a customary title affidavit in form and substance reasonably satisfactory to Fee Owner and reasonably required by New Bloom Retail Holdco's title company to issue an owner's title policy insuring title to the Retail Units to New Bloom Retail Holdco, subject only to the Retail Units Permitted Encumbrances; *provided*, that the Secured Creditors or their designee shall be entitled to file a notice with the Bankruptcy Court requesting that it enter an Order finding that the Debtors failed to make the Balance of Payoff Amount and that Escrowee is authorized to release the Escrowed Retail Transfer Documents to the Secured Creditors or their designee; *provided further* that the Debtors reserve the right to oppose such request in good faith solely on the bases that: (i) the Retail Closing Period has not expired; (ii) the Balance of Payoff Amount was paid to the Secured Creditors prior to the expiration of the Retail Closing Period; or (iii) acts or omissions by the Secured Creditors, their affiliates, or designees during the Retail Closing Period caused the failure of Fee Owner to be able to refinance the Retail Units and pay the Balance of Payoff Amount prior to expiration of the Retail Closing Period; ***provided further*** that the foregoing is not intended to, and shall not, establish any affirmative obligation of the Secured Creditors to facilitate the Debtors' efforts to obtain financing to make the Balance of Payoff Amount payment other than the obligations described in paragraph 2 of Exhibit B to the Plan (Management Terms for Condominium); *provided further* that any costs, fees or expenses incurred by the Secured Creditors in seeking such relief, if granted, shall be Administrative Claims payable by the Debtors or Third-Party Payors; and

14

(vi) Upon either payment of the Balance of Payoff Amount or release of the Escrowed Retail Transfer Documents to the Secured Creditors in accordance with sections C.2(c)(v)(a) or (b), respectively, (A) the Debtors and Guarantors are released from any and all obligations under the Loan Documents and Senior Loan Structuring Documents, including, without limitation, the Substitute Senior Note B and Substitute Senior Mortgage B and any guaranty with respect to such obligations, and New Bloom Retail Holdco shall be deemed to have, and shall have, assumed all debts and obligations under Substitute Senior Note B and Substitute Senior Mortgage B; and all of the Senior Secured Claims are fully satisfied and discharged, provided that such indebtedness and liens evidenced by Substitute Senior Note A and Substitute Senior Mortgage A shall continue to encumber the Residential Units and upon the Retail Unit Transfer, if any, Substitute Senior Note B and Substitute Senior Mortgage B shall continue to encumber the Retail Units and New Bloom Retail Holdco shall be deemed to have, and shall have, assumed all debts and obligations under Substitute Senior Note B and Substitute Senior Mortgage B, as set forth in section 5.1 of the Plan. For avoidance of doubt, neither of the Debtors or Guarantors shall have any obligation or liability under Substitute Senior Note B in excess of or separate and distinct from obligations to pay the Balance of the Payoff Amount hereunder.

(d) *Voting*. Class 1 is impaired. Holders of Allowed Senior Secured Claims are entitled to vote to accept or reject the Plan.

3. *Class 2: Mezzanine Secured Claims*.

(a) *Classification*. Class 2 consists of Mezzanine Secured Claims.

(b) *Allowance*. Solely as part of and pursuant to the settlement of all disputes between the Debtors and the Secured Creditors as reflected in the consensual Plan, the Mezzanine Secured Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $36,000,000, inclusive of all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Mezz Loan. The Mezz Debt Holder shall not be required to file amended or supplemental proofs of Claim on account of Senior Secured Claims. For the avoidance of doubt, if the Plan is not confirmed or the Effective Date does not occur, the amount of the Allowed Mezzanine Secured Claims shall be subject to further proceedings and determination by the Bankruptcy Court or agreement of the Debtors and Mezz Debt Holder.

(c) *Treatment*. Upon the Residential Unit Transfer (to occur on the Effective Date), all of the Mezzanine Secured Claims are fully satisfied and discharged.

(d) *Voting.* Class 2 is impaired. Holders of Allowed Mezzanine Secured Claims are entitled to vote to accept or reject the Plan.

15

4.      *Class 3: Mezzanine Deficiency Claims*.

(a)      *Classification*. Class 3 consists of Mezzanine Deficiency Claims, if any.

(b)      *Allowance*. Solely as part of and pursuant to the settlement of all disputes between the Debtors and the Secured Creditors as reflected in the consensual Plan, the Mezzanine Deficiency Claims, if any, are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors.  The Mezz Debt Holder shall not be required to file amended or supplemental proofs of Claim on account of Mezzanine Deficiency Claims, if any. For the avoidance of doubt, if the Plan is not confirmed or the Effective Date does not occur, the amount of the Allowed Mezzanine Deficiency Claims shall be subject to further proceedings and determination by the Bankruptcy Court or agreement of the Debtors and Mezz Debt Holder.

(c)      *Treatment*. Upon the Residential Unit Transfer (to occur on the Effective Date), all of the Mezzanine Deficiency Claims, if any, are fully satisfied and discharged.

(d)      *Voting.* Class 3 is impaired. Holders of Allowed Mezzanine Deficiency Claims, if any, are entitled to vote to accept or reject the Plan.

5.      *Class 4: General Unsecured Claims*.

(a)      *Classification*. Class 4 consists of General Unsecured Claims.

(b)      *Allowance*. All timely-filed General Unsecured Claims and General Unsecured Claims scheduled in the Debtors' bankruptcy schedules and not designated as contingent, unliquidated, or disputed shall be Allowed Claims and shall not be subject to any claim objection under the Plan.

(c)      *Treatment*. Each holder of an Allowed General Unsecured Claim shall receive (i) Cash equal to 50% of the Allowed amount of such Claim on the later of (a) thirty (30) days after the Effective Date and (b) the date that is the first Business Day after the date that is thirty (30) calendar days after the date such Claim becomes an Allowed Claim (the "Initial GUC Distribution") and (ii) Cash equal to the remaining 50% of the Allowed amount of such Claim on or before December 31, 2024 (the "Final GUC Distribution"). The Initial GUC Distribution shall be funded from projected Cash on hand in Fee Owner's Cash Management Account, and the Final GUC Distribution (subject to section 5.1(c) of the Plan) shall be funded by (i) the Debtors, if the Balance of Payoff Amount is paid or (ii) the Secured Creditors or their designee, if the Balance of Payoff Amount is not paid by the Debtors or their designee.

(d)      *Voting.* Class 4 is impaired. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.      *Class 5: Interests*.

(a)      *Classification*. Class 5 consists of Interests.

(b)      *Allowance*. All Interests scheduled in the Debtors' bankruptcy schedules shall be Allowed Interests and shall not be subject to any objection under the Plan.

16

(c) *Treatment.* In consideration of the Affiliate Capital Contribution and other commitments being made under the Plan by or on behalf of the holders of the Allowed Interests in the Debtors, each such holder shall retain its Allowed Interests.

(d) *Voting.* Class 5 is impaired. Holders of Allowed Interests are entitled to vote to accept or reject the Plan.

7. *Discharge of Secured Creditors' Claims.*

Upon the Residential Unit Transfer, $50,000,000 represents the aggregate amount of the Mezzanine Secured Claims, Mezzanine Deficiency Claims, if any, and a portion of the Senior Secured Claims being satisfied, discharged or assigned by the Debtors to, and assumed by, New Bloom Residential Holdco.

**D.   Means for Implementation**

1. *Transactions Related to the Loans and the Project.*

(a) *Modification of the Loans.*

Upon the Residential Unit Transfer (which shall occur on the Effective Date) as set forth in section D.1(b) below, the Mezzanine Secured Claims and the Mezzanine Deficiency Claim, if any, are fully satisfied and discharged.

Upon the Residential Unit Transfer, the total obligations outstanding under the Senior Loan shall be $60,000,000 (provided that the amount owed by the Debtors or Guarantors with respect to the Senior Secured Claims (including, without limitation, Substitute Senior Note B) shall not exceed the Balance of Payoff Amount), secured by liens which will continue to encumber the Residential Units and Retail Units as set forth in sections 4.2(c)(ii), 5.1(b) and 5.1(c) of the Plan.

Contemporaneously with the transfer of the Residential Units, Secured Creditors and Fee Owner will execute a Consolidation and Splitter Agreement (the "Senior Loan Splitter Agreement"), together with the documents identified therein, that restructures the Senior Loan (the "Senior Loan Structuring Transaction") by:

(i) reconsolidating that certain Promissory Note A dated as of January 12, 2021 held by Mortgage Debt Holder as assignee under which Fee Owner is the borrower ("Existing Senior Note A") and that certain Promissory Note B dated as of January 12, 2021 held by Mortgage Debt Holder as assignee under which Fee Owner is the borrower ("Existing Senior Note B" and with Existing Senior Note A, the "Existing Senior Notes") into a new Consolidated, Amended and Restated Promissory Note in the restructured principal amount of $60,000,000 (the "Consolidated Senior Note"), which Consolidated Senior Note shall substantially be in the form of the Existing Senior Notes;

(ii) splitting the Consolidated Senior Note into two substitute notes, with one substitute note in the amount of $14,000,000 encumbering the Residential Units ("Substitute Senior Note A"), and a second substitute note in the amount of $46,000,000

17

encumbering the Retail Units ("<u>Substitute Senior Note B</u>" and with Substitute Senior Note A, the "<u>Substitute Senior Notes</u>"), which Substitute Senior Notes shall substantially be in the form of the Consolidated Senior Note; and

(iii)         splitting that certain Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of January 12, 2021 held by Mortgage Debt Holder as assignee under which Fee Owner is the borrower (the "<u>Existing Senior Mortgage</u>") into two mortgages: a substitute mortgage encumbering the Residential Units ("<u>Substitute Senior Mortgage A</u>"), and a second substitute mortgage encumbering the Retail Units (the "<u>Substitute Senior Mortgage B</u>" and with Substitute Senior Mortgage A, the "Substitute Senior Mortgages" and with the Senior Loan Splitter Agreement, the Substitute Senior Notes, and such other documents executed in connection with the Senior Loan Structuring Transaction, the "<u>Senior Loan Structuring Documents</u>"), which Substitute Senior Mortgages shall substantially be in the form of the Existing Senior Mortgage.

Each of the Debtors and Secured Creditors will reasonably cooperate in executing applicable documentation in connection with the recording of the Senior Loan Splitter Agreement, the Substitute Senior Mortgages, and any other related documents, affidavits or required filings, except that the Debtors shall not be required to execute any affidavit pursuant to Section 275 of the Real Property Law of the State of New York or to incur any additional cost, expense, liability or obligation (other than their attorneys' fees in reviewing and negotiating such documentation). The filing and recording of all such documents shall be exempt from filing and recording fees pursuant to section 1146(a) of the Bankruptcy Code and section 12.4 of the Plan.

(b)         *Transfer of Residential Units*.

As of the Confirmation Date, 52 of the Project's residential units remain unsold as set forth on Schedule 5.1(b) of the Plan. On the Effective Date, Fee Owner shall execute and deliver to Mortgage Debt Holder the following documents transferring ownership of the Residential Units to New Bloom Residential Holdco in an "as is" condition (the "<u>Residential Unit Transfer</u>"): (1) a bargain and sale deed with covenants against grantor's acts (substantially in the form of the Unit Deed attached to the Offering Plan as Exhibit 7), subject to the permitted encumbrances listed on Exhibit A attached to the Plan and the liens or encumbrances created or filed by, on behalf of, or for the benefit of, any Secured Creditor in connection with the transactions contemplated under the Plan, including Substitute Senior Mortgage A (collectively, the "<u>Residential Units Permitted Encumbrances</u>"), (2) New York City and New York State transfer tax forms necessary for the transfer of the Residential Units, and (3) Fee Owner's organizational documents, consents or resolutions, and a customary title affidavit in form and substance reasonably satisfactory to Fee Owner and reasonably required by New Bloom Residential Holdco's title company to issue an owner's title policy insuring title to the Residential Units to New Bloom Residential Holdco subject only to the Residential Units Permitted Encumbrances (collectively the "<u>Residential Unit Transfer Documents</u>"); <u>provided</u> that, in addition to execution of the previously identified Residential Unit Transfer Documents, Fee Owner shall reasonably cooperate with and provide or execute, as applicable, any additional documents or information reasonably required by New Bloom Residential Holdco's title company as a condition to issuing an owner's title policy with respect to the Residential Units to New Bloom Residential Holdco (the "<u>Residential Unit Transfer</u>

18

Ancillary Documents"); <u>provided further</u> that if the Residential Unit Transfer Ancillary Documents are not delivered by Fee Owner within the later of five (5) Business Days after the Effective Date and ten (10) Business Days after the date on which Fee Owner receives a request from New Bloom Residential Holdco's title company for such Residential Unit Transfer Ancillary Documents, the Secured Creditors or their designee shall be entitled to file a notice with the Bankruptcy Court requesting that it enter an Order directing Fee Owner to provide such Residential Unit Transfer Ancillary Documents or authorizing the Secured Creditors or their designee to take all necessary actions on behalf of Fee Owner to satisfy such requests; <u>provided further</u> that the Debtors reserve the right to oppose such request in good faith solely on the basis that such request is unreasonable; <u>provided further</u> that any costs, fees or expenses incurred by the Secured Creditors in seeking such relief, if granted, shall be Administrative Claims payable by the Debtors or Third-Party Payors.

Except as expressly set forth in sections 5.3 and 10.6 of the Plan, upon completion of the Residential Unit Transfer, the Debtors and Guarantors shall be released from any and all obligations under or with respect to Substitute Senior Note A and Substitute Senior Mortgage A, including any guaranty of such obligations, and any and all obligations on account of the Residential Units under the Loan Documents and Senior Loan Structuring Documents; provided, however, Substitute Senior Mortgage A will continue to encumber the Residential Units transferred pursuant to the Plan, and New Bloom Residential Holdco shall be deemed to have, and shall have, assumed all debts and obligations under Substitute Senior Note A and Substitute Senior Mortgage A. Upon the Residential Unit Transfer, Mezzanine Debt Holder shall (i) discharge and release any and all liens encumbering any collateral for the Mezz Loan, (ii) execute and deliver to the Debtors any documents necessary for such discharge and release, and (iii) return any collateral for the Mezz Loan in Mezzanine Debt Holder's possession or control.

The Secured Creditors or their designee shall sweep and control all funds in the Cash Management Account and all Lease Proceeds to pay the operating expenses of the Project from and after the Effective Date, including, without limitation, the expense items identified in the Budget (as defined in the Final Cash Collateral Order) attached to the Final Cash Collateral Order as Exhibit 1, until the payment of the Balance of Payoff Amount, if any. Notwithstanding the foregoing, the Secured Creditors or their designee shall retain the balance of the Cash Management Account at the end of the Retail Closing Period. For the avoidance of doubt, to the extent an operating expense (including, but not limited to, property taxes) has accrued or becomes due prior to the expiration of the Retail Closing Period but has not yet been paid out of the Cash Management Account if and at the time the Debtors pay the Balance of the Payoff Amount, such expense shall be prorated based on the portion of such expense accruing during such period and such prorated amount paid by the Secured Creditors out of the Cash Management Account (or other funds of the Secured Creditors) and the balance paid by the Debtors, and the Secured Creditors shall be entitled to retain the balance of the Cash Management Account after payment of all such expenses.

Upon the transfer of the Residential Units to the Secured Creditors or their designee pursuant to the Plan, the governance provisions set forth in Exhibit B attached to the Plan shall apply to the condominium at the Project, in addition to all other governance documents and provisions for the condominium not inconsistent with the provisions in Exhibit B. The Debtors shall provide the Secured Parties or their designee with an assignment of Declarant Rights pursuant

19

to an Amendment to Declaration in form and substance reasonably acceptable to the Secured Creditors or their designee and Debtors ("Amendment to Declaration"). Any declarant rights to be retained by the Debtors shall be governed by the Amendment to Declaration. The Amendment to Declaration shall be recorded by Debtors contemporaneously with the transfer of the Residential Units. Debtors will cooperate with the Secured Creditors or their designee in terminating existing utility accounts, which termination shall occur on or about the Effective Date; provided, that any charges accruing to the existing utility accounts with respect to the Residential Units or the Project for periods following the Effective Date shall be paid by the Secured Creditors from the Cash Management Account.

(c)    *Treatment of Retail Units*.

On the Effective Date, the Escrowed Retail Transfer Documents for the Retail Units shall be delivered by Fee Owner to Escrowee and held in escrow by Escrowee pursuant to the Escrow Agreement. Pursuant to the terms of the Plan, the Debtors shall be entitled to pay to the Secured Creditors the Balance of Payoff Amount in exchange for release of the Escrowed Retail Transfer Documents to the Debtors and satisfaction of the mortgage and release of pledged collateral with respect to the Retail Units. Such payoff and release shall take place within 90 days from the Effective Date, which 90-day period may be extended for up to 30 days in order to satisfy any underwriting requirements of a non-affiliated lender refinancing the Retail Units, but in no event shall such period extend beyond December 31, 2024 (as may be extended, the "Retail Closing Period"); provided, however, that any such extension of the 90-day period may only occur if the Debtors have provided to the Secured Creditors prior to expiration of the 90-day period, the following: (a) an executed term sheet issued by such lender, (b) either a wire confirmation or an email from the lender evidencing or confirming that the Debtors have paid a non-refundable deposit to such lender for the term sheet and due diligence/underwriting process, (c) copies of bank statements evidencing any necessary equity funding being held in domestic accounts in the U.S. and (d) a then current copy of such lender's business and legal diligence checklist (which shall demonstrate the current status of the checklist items); provided further, however, that if a significant casualty event occurs to the Retail Units, such term sheet must be re-dated or re-issued to reflect that it is in effect post-casualty event; provided further, however, that if the Retail Closing Period is set to expire after December 20, 2024, and has not expired pursuant to the Plan as of December 20, 2024, the Debtors shall make the Final GUC Distribution so as to be received by each holder of an Allowed General Unsecured Claim by December 31, 2024, pursuant to section 4.5(c) of the Plan; provided further, however, that if the Debtors fail to make payment of the Balance of Payoff Amount prior to expiration of the Retail Closing Period in accordance with the Plan, the Secured Creditors shall within ten (10) Business Days following the Retail Unit Transfer reimburse the Debtors any amount of the Final GUC Distribution paid by the Debtors pursuant to the Plan.

During the Retail Closing Period, the Debtors shall retain ownership of the Retail Units. In order for the Debtors or their designee to retain ownership of the Retail Units after the Retail Closing Period, the Debtors or their designee must pay to the Secured Creditors or their designee the Balance of Payoff Amount before expiration of the Retail Closing Period. Simultaneously with the payment of the Balance of Payoff Amount, the Secured Creditors shall release, discharge, terminate, and remove any liens or encumbrances created or filed by or on behalf of either of the

Secured Creditors upon or against the Retail Units, and Escrowee shall release the Escrowed Retail Transfer Documents to the Debtors or their designee. Upon payment of the Balance of Payoff Amount, the Secured Creditors or their designee shall no longer be entitled to the Lease Proceeds, and the Debtors or their designee may direct the payment by Rental Unit tenants of Lease Proceeds accruing for all periods following payment of the Balance of Payoff Amount to another account of the Debtors' or their designee's choosing. Any Lease Proceeds received by the Secured Creditors or their designee accruing for any period following payment of the Balance of Payoff Amount shall be transferred to the Debtors or their designee within ten (10) Business Days of receipt. For the avoidance of doubt, the Debtors shall be authorized under the Plan to form a new entity to serve as their designee to pay the Balance of Payoff Amount and to receive an assignment from Fee Owner of title to the Retail Units concurrently with the payment of the Balance of Payoff Amount.

If the Debtors fail to pay the Balance of Payoff Amount prior to the expiration of the Retail Closing Period, then upon expiration of the Retail Closing Period, the Escrowed Retail Transfer Documents shall be released from escrow by Escrowee to New Bloom Retail Holdco, dated as of the first day following the expiration of the Retail Closing Period (the "Retail Unit Transfer"); provided that the foregoing identified Escrowed Retail Transfer Documents and the release thereof shall not preclude New Bloom Retail Holdco's title company from requiring other documents or information from Fee Owner reasonably necessary to issue an owner's title policy with respect to the Retail Units to New Bloom Retail Holdco (the "Retail Unit Transfer Ancillary Documents") and Fee Owner shall reasonably cooperate with any such request.

Upon the Secured Creditors' determination that (a) the Retail Closing Period has expired without Debtors' payment in full in cash of the Balance of Payoff Amount or agreement to release the Escrowed Retail Transfer Documents, the Secured Creditors or their designee shall be entitled to file a notice with the Bankruptcy Court requesting that it enter an Order finding that the Debtors failed to timely make the Balance of Payoff Amount and that the Escrowee is authorized to release the Escrowed Retail Transfer Documents to New Bloom Retail Holdco; provided that the Debtors reserve their rights to oppose such request in good faith solely on the bases that: (i) the Retail Closing Period has not expired; (ii) the Balance of Payoff Amount was paid to the Secured Creditors prior to the expiration of the Retail Closing Period; or (iii) acts or omissions by the Secured Creditors, their affiliates, or designees during the Retail Closing Period caused the failure of Fee Owner to be able to refinance the Retail Units and pay the Balance of Payoff Amount prior to expiration of the Retail Closing Period; provided further that the foregoing is not intended to, and shall not, establish any affirmative obligation of the Secured Creditors to facilitate the Debtors' efforts to obtain financing to make the Balance of Payoff Amount payment other than the obligations described in paragraph 2 of Exhibit B to the Plan (Management Terms for Condominium), or (b) the Retail Unit Transfer Ancillary Documents are not delivered by Fee Owner within the later of five (5) Business Days after the expiration of the Retail Closing Period and ten (10) Business Days after the date on which Fee Owner receives a request from New Bloom Retail Holdco's title company for such Retail Unit Transfer Ancillary Documents, the Secured Creditors or their designee shall be entitled to file a notice with the Bankruptcy Court requesting that it enter an Order directing Fee Owner to provide the Retail Unit Transfer Ancillary Documents and authorizing the Secured Creditors or their designee to take all necessary actions on behalf of Fee Owner to satisfy such requests; provided, that the Debtors reserve their rights to oppose such

request based solely on a good faith belief that such request is unreasonable; provided further, in each case, that any costs, fees or expenses incurred by the Secured Creditors in seeking such relief, if granted, shall be Administrative Claims payable the Debtors or Third-Party Payors.

Upon release of the Escrowed Retail Transfer Documents to New Bloom Retail Holdco, the Debtors and Guarantors shall be deemed to have been released, and shall be released, from any and all obligations under or with respect to Substitute Senior Note B and Substitute Senior Mortgage B, including any guaranty of such obligations, and any and all obligations under the Loan Documents and Senior Loan Structuring Documents; provided, however, Substitute Senior Mortgage B shall continue to encumber the Retail Units and New Bloom Retail Holdco shall be deemed to have, and shall have, assumed all debts and obligations under Substitute Senior Note B and Substitute Senior Mortgage B.

(d)    *Abandonment of Personal Property*.

Upon the Residential Unit Transfer, Fee Owner shall be deemed to have, and shall have, abandoned its ownership interest in any personal property located within the Residential Units pursuant to section 554(a) of the Bankruptcy Code.

2.    *Effectuating Documents; Further Transactions*.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects in accordance with and subject to the terms hereof. On or before the Effective Date, the authorized officers of the Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan or otherwise necessary or desirable to effectuate the transactions contemplated by the Plan in the name of and on behalf of the Debtors. The authorizations and approvals contemplated in the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

3.    *Conflict Between Plan and Loan Documents or Senior Loan Structuring Documents; Termination of Forbearance Agreement and State Court Litigation*.

(a)    In the event of any conflict between the terms of the Plan, on the one hand, and the Loan Documents, the Forbearance Agreement, or the Senior Loan Structuring Documents, on the other hand, the terms of the Plan shall govern and control.

(b)    For avoidance of doubt, any claim by any of the Secured Creditors against the Debtors or Guarantors arising from any alleged breach during the Retail Closing Period of any term, covenant, condition or obligation set forth in the Loan Documents or the Senior Loan Structuring Documents or otherwise as relates to the Retail Units shall be deemed to be released by and upon the payment of the Balance of Payoff Amount or the Retail Unit Transfer, as provided in and pursuant to Articles IV and V of the Plan, except for (x) any such claim involving physical damage to the Retail Units occurring after the Confirmation Date and prior to the Retail Unit Transfer (if applicable), if and to the extent such damage resulted from the willful misconduct or gross negligence of Fee Owner, or (y) any such claim for actual damages (excluding indirect, consequential, special, punitive and exemplary damages except to the extent actually incurred by the Secured Creditors as a result of claims from unaffiliated third parties) (any claim under (x) or

22

(y), a "<u>Retail Closing Period Damage Claim</u>"); <u>provided</u> that (A) the Secured Creditors shall not have any Retail Closing Period Damage Claim under section 5.3(b)(x) above if the Debtors pay the Balance of the Payoff Amount, and (B) no such Retail Closing Period Damage Claim shall arise on account of the Debtors' or the Guarantors' failure to comply, and the Debtors and Guarantors shall have no obligation to comply, with the following:

(i)    financial covenants, if any, set forth in the Loan Documents;

(ii)    financial payment obligations related to debt service or reserve funding set forth in the Loan Documents; or

(iii)    financial reporting covenants set forth in Section 6.3 of the Senior Loan Agreement; <u>provided</u>, <u>however</u>, that Fee Owner shall be required to deliver to Mortgage Debt Holder copies of any and all notices or correspondence received from, or delivered to, any Retail Unit tenants, government entities or authorities, taxing authorities, insurers, or other material notices or correspondence related to the Retail Units (including any notices or correspondence related to any casualty or condemnation event).

(c)    For the avoidance of doubt, any ordinary-course repairs or maintenance of the Retail Units during the Retail Closing Period required to be made in accordance with the applicable lease or leases and the Loan Documents shall be made by Fee Owner or its agent, and Fee Owner shall be entitled to draw from the Cash Management Account for all such operating expenses.

(d)    Any Retail Closing Period Damage Claim existing from and after the expiration of the Retail Closing Period shall be deemed waived and released if no litigation to assert such claim has been commenced within one (1) year after expiration of the Retail Closing Period.

(e)    Upon the Effective Date, (i) the escrow currently held by Reed Smith LLP pursuant to the Forbearance Escrow Agreement shall be dissolved and all documents held in escrow pursuant to such Forbearance Escrow Agreement shall be returned to the Debtors and the Forbearance Escrow Agreement, (ii) the A&R Operating Agreement (as defined in the Forbearance Agreement) and the Strict Foreclosure Document (as defined in the Forbearance Escrow Agreement) shall be deemed null and void, and (iii) the Forbearance Agreement shall be deemed null and void, except that payments to the Secured Creditors made thereunder shall not be discredited.

(f)    Upon the Effective Date, the Debtors and the Secured Creditors shall execute a stipulation of discontinuance and dismissal of the State Court Action with prejudice.

4.    *Certain Insurance and Casualty Matters.*

(a)    Notwithstanding any provisions to the contrary contained in the Loan Documents or the Senior Loan Structuring Documents, in the event there is a casualty or condemnation event affecting or with respect either the Residential Units or the Retail Units the

Debtors and the Guarantors obligations to restore any of the Residential Units or Retail Units shall be governed by the provisions set forth in this section D.4(a).

(b)    In the event there is a casualty or condemnation event affecting or with respect to the Residential Units prior to or after the Residential Unit Transfer, any corresponding insurance proceeds recovered or condemnation award shall belong to Mortgage Debt Holder or New Bloom Residential Holdco, as appropriate.  The Debtors shall, and hereby do, assign any of their rights to such insurance proceeds or condemnation award, as applicable, to Mortgage Debt Holder and, alternatively, New Bloom Residential Holdco, as appropriate.

(c)

(i)    In the event there is a casualty or condemnation event affecting or with respect to the Retail Units prior to expiration of the Retail Closing Period, Fee Owner and Mortgage Debt Holder shall cooperate in the Debtors' performance of any immediate steps to repair or remedy the situation as may be required of landlord under the terms of any applicable Retail Unit lease(s) or by applicable health and safety laws (the "Remedial Actions"), subject to the terms of this section D.4 and to ensure such actions are appropriate and being performed in a workman-like manner and within the time frames required under applicable Retail Unit lease(s).

(ii)    Fee Owner shall provide prompt written notice to Mortgage Debt Holder whether it will undertake the Remedial Actions during the Retail Closing Period. If it elects to not undertake Remedial Actions, the Retail Closing Period shall immediately be deemed expired and trigger a Retail Unit Transfer.

(iii)    Solely to the extent the Debtors reasonably believe that any repair to the Retail Units arising out the of the casualty or condemnation is immediately required under the terms of any applicable Retail Unit lease(s) or by applicable health and safety laws, prior to receiving approval of Mortgage Debt Holder, the Debtors shall be permitted to take such Remedial Actions as they deem reasonably necessary at such time, upon giving notice to Mortgage Debt Holder.

(iv)    For the avoidance of doubt, any Remedial Actions taken by Fee Owner shall not create an obligation to continue such work after the Retail Closing Period if the Debtors do not make the Balance of Payoff Amount payment.

(v)    Any insurance proceeds related to any such casualty or condemnation shall be held in the Cash Management Account to be used to fund such repairs and inure to the owner of the Retail Units at any moment in time. In the absence of sufficient insurance proceeds, the Mortgage Debt Holder shall disburse to the Debtors amounts in reimbursement therefor from the Cash Management Account up to an amount not to exceed $100,000, which amounts shall be repaid from any insurance proceeds or otherwise added to the Balance of Payoff Amount upon the Debtors' payment of the Balance of Payoff Amount, if any.

(d)    For the avoidance of doubt, in no event shall the occurrence of a casualty or condemnation event or the status of any Remedial Action (whether or not commenced or

24

completed) cause, or serve as grounds for, an extension of the Retail Closing Period and such Retail Closing Period shall not be extended on the basis thereof.

(e)     For the avoidance of doubt, any insurance proceeds or condemnation award, as applicable, pertaining to insurance coverage maintained by the Condominium Board with respect to the Project pursuant to the terms of the Condominium Documents shall be paid, held, used and otherwise distributed in accordance with the terms of the Condominium Documents; and

(f)     Upon the Debtors' assignment of insurance proceeds or condemnation award, as applicable, if and as required under this section D.4(e), the Debtors and Guarantors shall have no further obligations or liabilities with respect any casualty or condemnation event affecting or with respect to the Residential Units or the Retail Units, as applicable, and the Secured Creditors waive any right to claim a Casualty Event of Default as defined in the Loan Documents.

5.     *Certain Tax Matters*. For U.S. federal income tax purposes, and comparable state and local tax purposes (as applicable):

(a)     The Debtors shall implement the Plan in a manner such that they shall continue to be treated as disregarded entities through the implementation of the Plan on the Effective Date and shall not take any action that would cause the Debtors to be treated as an association taxable as a corporation at any relevant time prior to the final discharge of Debtors' obligations under the Substitute Senior Notes.

(b)     The Debtors and all holders of Allowed Claims shall report consistent with this section D.5(b) for all income tax purposes and shall: (i) use commercially reasonable efforts to cause consistent reporting therewith by others; and (ii) not join in, encourage, and/or support inconsistent reporting therewith by others.

## E.     **Distributions**

1.     *Distributions Generally*.

The Initial GUC Distribution and the Final GUC Distribution shall be made to the appropriate holders of Allowed Class 4 Claims in accordance with the terms of the Plan by the Secured Creditors or their designee, Fee Owner, Holdco, or a designee of Fee Owner or Holdco, as applicable.

2.     *Claims Record Date*.

On the Confirmation Date, the Debtors' records of the holders of Claims and Interests shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder for purposes of the Plan, and there shall be no further changes in the record holders of any such Claims or Interests; provided, however, that the foregoing shall not preclude the Debtors from asserting and prosecuting any timely objections to Claims or Interests of the record holders pursuant to the Plan.

3.      *Post-petition Interest on Claims*.

Except as otherwise required under the Bankruptcy Code or orders of the Court, or as otherwise provided in the Plan, interest shall not accrue or be paid on any Allowed Claims against the Debtors on or after the Petition Date.

4.      *Unclaimed Property*.

Undeliverable distributions shall remain in the possession of the Secured Creditors or their designee, Fee Owner, Holdco, or a designee of Fee Owner or Holdco, as applicable, until such time as a distribution becomes deliverable or a holder accepts distribution. Such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) and forfeited at the expiration of one hundred and twenty (120) days from the applicable date of distribution, and the obligation to make a distribution to the holder of the Allowed Claim shall be deemed discharged and the holder's claim of entitlement to the distribution forever barred, notwithstanding any federal or state escheat laws to the contrary. After such date, all unclaimed property or interest in such property shall revert to and vest in the Secured Creditors or their designee, Fee Owner, Holdco, or a designee of Fee Owner or Holdco, as applicable. Requests for re-issuance of any check prior to the expiration of the one hundred and twenty (120) day period from the date of issuance may be made to the Secured Creditors or their designee, Fee Owner, Holdco, or a designee of Fee Owner or Holdco, as applicable, by the holder of the Allowed Claim to whom such check was originally issued. Nothing herein shall require the Secured Creditors or their designee, Fee Owner, Holdco, or a designee of Fee Owner or Holdco, as applicable, to attempt to locate holders of undeliverable distributions.

5.      *Manner of Payment Under Plan*.

Except as otherwise specifically provided in the Plan, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or pursuant to customary practices.

6.      *Setoff and Recoupment*.

With respect to any distribution to be made on account of an Allowed Class 4 Claim, the Debtors, or their designees may, but shall not be required to, set off or recoup against such distribution any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors may have against the holder of such Allowed Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, however, that neither the failure to do so nor the allowance of any Allowed Claim hereunder shall constitute a waiver or release by the Debtors or their successors, of any claims, rights, or Causes of Action that the Debtors, or their successors or assigns may possess against the holder of such Allowed Claim.

7.      *No Distribution in Excess of Amount of Allowed Claim*.

No holder of an Allowed Class 4 Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

26

8.    *Distributions Free and Clear*.

Any distributions under the Plan shall be free and clear of all Liens, Claims, and encumbrances, and no Entity, including the Debtors, shall have any interest, legal, beneficial, or otherwise, in any amounts transferred pursuant to the Plan, other than the transferee and its designee, if applicable.

9.    *Reporting Requirements*.

Any party entitled to receive any property as a distribution under the Plan shall, upon request of the Debtors, deliver to the Debtors an appropriate Internal Revenue Service Form W-9 or (if the payee is a foreign Entity) Form W-8, and any other reasonably requested tax information. If such request is made by the Debtors and the holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, the amount of any such distribution shall irrevocably revert to Fee Owner or Holdco, as the case may be, and any Claim on account of such distribution shall be discharged and forever barred from assertion against the Debtors or their property.

**F.    Procedures for Disputed Claims**

1.    *Objections to Claims*.

Nothing under the Plan shall affect the Debtors' claims, Causes of Action, rights, or defenses in respect of any Class 4 Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Claims. Any objections to Class 4 Claims shall be served and filed by the Debtors on or before the later of: (a) thirty (30) calendar days after the Effective Date; and (b) on such other date as ordered by the Bankruptcy Court for cause.

2.    *Resolution of Disputed Administrative Expenses and Disputed Claims*.

On and after the Effective Date, except as otherwise provided herein, all Claims that are not then Allowed will be satisfied, disputed, pursued, or otherwise reconciled in accordance with the Plan and may be compromised, settled, or otherwise resolved without further approval of the Bankruptcy Court.

3.    *Payments and Distributions with Respect to Disputed Claims*.

Except as otherwise provided in the Plan, if any portion of a Class 4 Claim is a Disputed Claim, the Secured Creditors or their designee, Fee Owner, Holdco, or a designee of Fee Owner or Holdco, as applicable, shall not be required to make any payment or distribution provided hereunder on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

4.      *Distributions After Allowance*.

After a Disputed Class 4 Claim becomes an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan. Such distributions shall be made in accordance with Article VI of the Plan.

5.      *Estimation of Claims*.

The Debtors may: (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court; and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors may pursue supplementary proceedings to object to the allowance of such Claim; provided, however, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

6.      *Claim Resolution Procedures Cumulative*.

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Class 4 Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.      *Insured Claims*.

If any portion of an Allowed Class 4 Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Court.

**G.     Executory Contracts and Unexpired Leases**

1.      *General Treatment*.

(a)      Subject to paragraph 4 below, (a) all executory contracts or unexpired leases in effect as of the date of the Residential Unit Transfer that pertain solely to the operation and management of the Residential Units and/or the common areas shall be deemed assumed by the Debtors and assigned to the Secured Creditors or their designee, or, if designated by the Secured

Creditors in writing to the Debtors prior to the Effective Date, rejected by the Debtors within ten (10) Business Days following the Effective Date by filing a notice of rejection with the Bankruptcy Court (and failure to do so shall be deemed an assumption), and (b) with respect to all other executory contracts and unexpired leases, if (i) the Debtors duly pay the Balance of Payoff Amount, they shall be assumed or rejected by the Debtors within ten (10) Business Days following payment of the Balance of Payoff Amount by filing a Notice with the Bankruptcy Court of assumption or rejection (and failure to do so shall be deemed an assumption), and (ii) if the Debtors fail to pay the Balance of Payoff Amount, they shall be assumed by the Debtors and assigned to the Secured Creditors or their designee or, if designated by the Secured Creditors in writing to the Debtors prior to the Retail Closing Period, rejected by the Debtors within ten (10) Business Days following expiration of the Retail Closing Period by filing a Notice with the Bankruptcy Court of such assumption and assignment or rejection (and failure to do so shall be deemed an assumption); provided, however, that any rejection damage claim that may arise will be the sole responsibility of the party designating the contract or lease for rejection. To the best of their knowledge, the Debtors do not believe they are in arrears with respect to any payment obligation of the Debtors under any of their executory contracts and unexpired leases. Accordingly, unless a proof of claim was timely filed by the non-Debtor party to any such contract or lease asserting a cure amount, and subject to the right of the applicable Debtor to object to any such Claim, the Debtors' assumption or assumption and assignment of executory contracts and unexpired leases under the Plan shall not require any cure payment under section 365 of the Bankruptcy Code with respect to the period through the Effective Date of the Plan to effectuate such assumption. For the avoidance of doubt, as of the Effective Date, Fee Owner assumes all unexpired leases for the Retail Units.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumption (and, if applicable, assignment) or rejection of executory contracts and unexpired leases provided for in the Plan pursuant to Bankruptcy Code sections 365(a) and 1123 and a determination by the Bankruptcy Court that the Debtors have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the Debtors, their designee, or their assignee in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

2.    *Rejection Damages Claims*.

Subject to paragraph 4 below, in the event that the rejection of an executory contract or unexpired lease hereunder by the Debtors results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Secured Creditors or their designee as the case may be (depending on which party has designated the contract or lease for rejection, per paragraph 1(a) above), or their respective properties or interests in property, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Secured Creditors no later than thirty (30) calendar days after the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims and paid the Initial GUC Distribution

by the Secured Creditors and the Final GUC Distribution by the Debtors or the Secured Creditors in accordance with section 4.5(c) of the Plan.

3.    *Insurance Policies*.

On the Effective Date: (i) all insurance policies issued or providing coverage to the Debtors shall be treated as executory contracts in accordance with paragraph 1 above; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court: (I) workers' compensation claims; (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim; and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies. To the extent such policies pertain solely to the Condominium and associated common areas and are assignable, they shall be assigned to the Secured Creditors or their designee as of the date of the Residential Unit Transfer. To the extent assignable, all policies pertaining solely to the Retail Units shall be assigned to the Secured Creditors or their designee as of the expiration of the Retail Closing Period, if the Debtors do not pay the Balance of Payoff Amount.

4.    *Douglas Elliman Brokerage Agreement*.

(a)    As of the Confirmation Date, Fee Owner's brokerage agreement ("Brokerage Agreement") with Douglas Elliman ("Elliman") shall be deemed rejected.

(b)    In accordance with the Brokerage Agreement, the Debtors shall provide to the Secured Creditors Elliman's list of procured prospective purchasers within ten (10) Business Days following the Confirmation Date.

(c)    Notwithstanding rejection of the Brokerage Agreement, the Secured Creditors and their designee, if any, shall comply with the obligations of Fee Owner under section 12(b) of the Brokerage Agreement, including the obligation post-termination to report to Elliman regarding Residential Unit sales.

(d)    Any brokerage fees alleged by Elliman to be owed to Elliman for sales of Residential Units prior to the Confirmation Date and any other amounts alleged by Elliman to be owed for actions taken prior to or after the Confirmation Date by the Debtors or Elliman at the direction of the Debtors (including, without limitation, the sale of any of the Residential Units prior to the Confirmation Date to purchasers on the list of prospective purchasers provided by

Elliman in accordance with section 12(b) of the Brokerage Agreement) shall be the sole responsibility of the Debtors.

(e)     Any brokerage fees alleged by Elliman to be owed to Elliman for sales of Residential Units after the Confirmation Date and any other amounts alleged by Elliman to be owed for actions taken after the Effective Date by the Secured Creditors or their designee, if any, or Elliman at the direction of the Secured Creditors or their designee (including, without limitation, the sale of any of the Residential Units after the Confirmation Date to purchasers on the list of prospective purchasers provided by Elliman in accordance with section 12(b) of the Brokerage Agreement) shall be the sole responsibility of the Secured Creditors and their designee, if any.

5.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*.

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease.

6.     *Reservation of Rights*.

Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors under any executory or non-executory contract or any unexpired or expired lease.

## H.     Conditions Precedent to Confirmation of Plan and Effective Date

1.     *Conditions Precedent to Confirmation of Plan*.

The following are conditions precedent to confirmation of the Plan:

(a)     the Disclosure Statement shall have been approved by the Bankruptcy Court; and

(b)     all Definitive Documents have been approved in form and substance by the Debtors and the Secured Creditors.

2.     *Conditions Precedent to Effective Date*.

The following are conditions precedent to the Effective Date of the Plan:

(a)     the Confirmation Order shall have been entered and, subject to any stay, shall otherwise be in full force and effect;

(b)     the Confirmation Order shall have become a Final Order;

(c)     all Definitive Documents contemplated to be executed as of the Effective Date shall have been executed by all parties thereto;

31

(d)    the Debtors, on behalf of themselves, their affiliates, agents, assigns, and Estates, and the Secured Creditors, on behalf of themselves, their affiliates, agents, and assigns shall provide to each other a written acknowledgement that as of the Effective Date they are not aware of any Released Claims against one another arising from willful misconduct; and

(e)    the Escrowed Retail Transfer Documents shall be delivered by Fee Owner to Escrowee and held in escrow by Escrowee pursuant to the Escrow Agreement.

3.    *Waiver of Condition Precedent.*

Any condition precedent in section 9.2 of the Plan may be waived, in whole or in part, in writing by the Debtors and the Secured Creditors jointly. Without limiting the foregoing, if all objections to the Plan have been resolved consensually or withdrawn as of the Confirmation Date, the Confirmation Order shall be deemed a Final Order as of the Confirmation Date for purposes of section 9.2(b) of the Plan.

4.    *Effect of Failure of a Condition.*

If the conditions listed in section H.2 above are not satisfied, the Plan shall not become effective and shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any claims by or Claims against the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Entity.

**I.    Effect of Confirmation of Plan**

1.    *Vesting of Assets.*

On the Effective Date, pursuant to Bankruptcy Code sections 1141(b) and (c), any and all property of the Debtors' Estates shall vest in the Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests except as provided pursuant to the Plan and the Confirmation Order. On and after the Effective Date, the Debtors may take any action, including, without limitation, the assertion of any Causes of Action; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether or not in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein. Without limiting the foregoing, the Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

2.    *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders are: (a) Impaired or Unimpaired under the Plan; (b) presumed to accept or deemed to reject the

Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) will receive any distribution under the Plan.

3.    *Discharge of Claims and Termination of Interests*.

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by Bankruptcy Code section 1141, of and from any and all Claims, rights, and liabilities of the Debtors that arose prior to the Effective Date. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to Bankruptcy Code section 524, from prosecuting or asserting against the Debtors any such discharged Claim against the Debtors.

4.    *Term of Injunctions or Stays*.

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

5.    **Injunction**.

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan or in relation to any Claim extinguished, discharged, or released pursuant to the Plan; provided, however, the foregoing shall not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as expressly agreed to by the Debtors and a holder of a Claim, all Entities who have held, hold, or may hold a Claim and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims that will be or are extinguished, discharged, or released pursuant to the Plan from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtors or the property of any of the Debtors; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors or the property of any of the Debtors; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, or the property of any of the Debtors; (iv) asserting any right of setoff, directly or indirectly, against any obligation owing to the Debtors, or against**

33

property or interests in property of any of the Debtors, except as provided in the Plan; (v) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan; and (vi) exercising any remedies under the Loan Documents or the Definitive Documents.

    6.    ***Releases***.

    (a)    <u>**Mutual Releases of Debtors and Secured Creditors**</u>.

**As of the Effective Date, but subject to section 10.6(b) of the Plan and except for the rights that remain in effect from and after the Effective Date to enforce: (i) the Plan; and (ii) the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the services rendered by the Released Parties to formulate and facilitate confirmation and consummation of the Plan, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed released and discharged, to the maximum extent permitted by law, by the Debtors, their Estates, the Secured Creditors, and each of the other Released Parties, on behalf of themselves and their respective successors, assigns, and representatives, and any and all Persons that may purport to assert any Cause of Action or cause of action derivatively, by, through or on behalf of any of the Released Parties, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that any of the Released Parties would have been legally entitled to assert in their own right or on behalf of the holder of any Claim or Interest or other Person against another Released Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Project, the Chapter 11 Cases, the transfer, purchase, or sale of any asset of the Debtors, the business or contractual arrangements between any of the Debtors and any Released Party, including, but not limited to the Loans, Loan Documents, and the Forbearance Agreement, the restructuring of any Claim or Interest during the Chapter 11 Cases, the Disclosure Statement, the Plan the Definitive Documents, or any related agreements, instruments, and other documents, and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission (collectively, "<u>Released Claims</u>"), in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; <u>provided</u>, <u>however</u>, that nothing in this section I.6(a) shall be construed to release the Released Parties from (X) such Released Claims to the extent arising from willful misconduct (subject to section H.2(d) above) or fraud, in each case as determined by a Final Order or (Y) subject to section 5.3 of the Plan, any Retail Closing Period Damage Claim; <u>provided further</u>, <u>however</u>, that the Debtors and Guarantors ("<u>Indemnitors</u>") shall indemnify the Secured Creditors for costs and liabilities incurred by the Secured Creditors arising from claims or causes of action asserted by third-party purchasers of residential units based on: (a) allegations of any inaccurate or incomplete disclosure or misrepresentations made by Fee Owner (the "<u>Original Sponsor</u>") in the Offering Plan, (b) allegations of construction defects or incomplete work undertaken by or**

34

on behalf of the Original Sponsor, and (c) failure of the Original Sponsor to comply with the provisions of the Offering Plan, excluding any amendments to the Offering Plan filed by the Secured Creditors or their designee as Successor-Sponsor (collectively, the "**Original Sponsor Claims**"); provided that the Secured Creditors file the "**Successor-Sponsor Amendment**" (as defined in the Management Terms for Condominium in Exhibit B) to the Offering Plan. Indemnitors shall have the right to select counsel and control the defense of Original Sponsor Claims, including, without limitation, any settlements. The Released Parties shall be permanently enjoined from prosecuting any of the foregoing claims or Causes of Action released under this section I.6(a) against each of the other Released Parties.

(b)    Notwithstanding any provision in the Plan or the Confirmation Order to the contrary, the Releases in section 10.6(a) of the Plan shall not apply to any Released Claims based on or relating to, or in any manner arising from, the Retail Units, including Substitute Senior Note B, and Substitute Senior Mortgage B unless and until, either completion of the Retail Unit Transfer or the payment of the Balance of Payoff Amount, in each case in accordance with the Plan, at which time Debtors shall be released from any and all Released Claims that any of the Released Parties have or may have through the date of the Retail Unit Transfer or payment of the Balance of Payoff Amount, as applicable, including, but not limited to, the Allowed Senior Secured Claim, Allowed Mezzanine Secured Claim, and Allowed Mezzanine Deficiency Claim, if any, Substitute Senior Note B, and Substitute Senior Mortgage B; provided, however, that such releases shall not release the Debtors from (i) subject to section 5.3 of the Plan, Retail Closing Period Damage Claims, and (ii) the indemnification obligations under section 10.6(a) above with respect to Original Sponsor Claims.

(c)    Notwithstanding anything to the contrary herein, nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

(d)    **Guarantor Releases**.

The Guarantors under the Loans and Loan Documents shall be deemed, and shall be, discharged and released of any liability with respect to the Allowed Senior Secured Claims, the Allowed Mezzanine Secured Claim, and, if any, the Allowed Mezzanine Deficiency Claim, the Loans, Loan Documents, Forbearance Agreement, and Definitive Documents, and any obligations under the guarantees given in connection with the foregoing, and any other liabilities for which the Debtors are released pursuant to section 10.6(a) and section 10.6(b) of the Plan solely to the extent the Debtors are released pursuant to the Plan, including pursuant to sections 10.6(a) and (b) of the Plan; provided, however, that the Guarantors shall not be released from the obligations under sections 5.3 or 10.6(a) of the Plan with respect to Retail Closing Period Damage Claims or the Original Sponsor Claims.

7.    *Exculpation*.

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and

liability for any conduct occurring on or after the Petition Date and up to and including the Effective Date in connection with or arising out of the filing and administration of the Chapter 11 Cases, the Disclosure Statement and the Plan, including the formulation, negotiation, preparation, dissemination, solicitation, confirmation, funding, consummation, implementation, and administration thereof or the transactions in furtherance of any of the foregoing; except for acts or omissions of an Exculpated Party that constitute gross negligence, fraud, or willful misconduct, in each case as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

        8.    *Retention of Causes of Action/Reservation of Rights*.

Except as otherwise provided in sections 10.5, 10.6, and 10.7 of the Plan, or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, all of which are preserved to the Debtors and may be pursued or abandoned by the Debtors in their sole discretion. Except as otherwise provided in the Plan, the Debtors shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any claim of the Debtors or Claim against the Debtors may be asserted by the Debtors after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

## J.    Retention of Jurisdiction

        1.    *Retention of Jurisdiction*.

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes, subject to the right of the Debtors to resolve any such matters post-Effective Date without Court approval, as provided in the Plan:

        (a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

        (b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

        (c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the

36

recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any counterclaims of the Debtors and their Estates;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter, and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with Bankruptcy Code section 1127, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Fee Claims;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing, including without limitation, entering an Order finding that the Debtors failed to make payment of the Balance of Payoff Amount satisfying conditions for the Escrowee to release the Escrowed Retail Transfer Documents to the Secured Creditors or their designee in accordance with the Plan;

(j)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(k)    to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146 (including any Disputed Claims for taxes and any requests for expedited determinations under Bankruptcy Code section 505(b));

(l)    to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, exculpations, and injunctions issued thereunder;

(m)    to resolve disputes concerning Disputed Claims or the administration thereof;

(n)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(o)    to enter a final decree closing the Chapter 11 Cases;

37

(p)    to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, or any deadline for responding or objection to a Cure Amount, in each case, for any purpose;

(q)    to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, including, without limitation, Avoidance Actions; and

(r)    to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in Bankruptcy Code sections 502 or 503, other than defenses or limits that are asserted under non-bankruptcy law pursuant to Bankruptcy Code section 502(b)(1).

2.    *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**K.    Miscellaneous Provisions**

1.    *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Debtors shall make all required filings and pay all fees incurred pursuant to section 1930 of chapter 123 of title 28 of the United States Code (including any such fees on account of any distributions under the Plan on and after the Effective Date), together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtors' cases, until such time as a final decree is entered closing each of the Debtors' respective Chapter 11 Cases, a Final Order converting the Debtors' cases to cases under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtors' cases is entered; provided, however, that such fees accruing postpetition prior to the Effective Date shall be paid from the Cash Management Account under the control of the Secured Creditors or their designee; provided further, however, that the Secured Creditors and any designee of the Secured Creditors shall cooperate in providing to the Debtors all required information for preparation of quarterly post-confirmation operating reports to the U.S. Trustee. Notwithstanding the foregoing, the Plan is contingent on the absence of any fee being generated and owed pursuant to 28 U.S.C. section 1930(a)(6)(B) as a result of the release of the Secured Creditors' collateral to the Secured Creditors pursuant to the Residential Unit Transfer, and a specific ruling on this point by the Bankruptcy Court will be proposed in the Confirmation Order. Absent such ruling, the Debtors may withdraw the Plan. Moreover, the Debtors reserve the right to seek a further ruling of the Bankruptcy Court at the appropriate time, if this bankruptcy case is still open, determining whether a fee would be generated and owed pursuant to 28 U.S.C. section 1930(a)(6)(B) as a result of the release of the

Secured Creditors' collateral pursuant to the Retail Unit Transfer or as a result of the payment of the Balance of Payoff Amount.

     2.    *Substantial Consummation of the Plan*.

Without limitation, upon transfer of the Residential Units to the Secured Creditors or their designee pursuant to paragraph 4.2 of the Plan, the Plan shall be deemed to be substantially consummated under Bankruptcy Code sections 1101 and 1127(b), if not earlier.

     3.    *Plan Supplement*.

The Plan Supplement, if any, shall be filed with the Clerk of the Bankruptcy Court. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

     4.    *Exemption from Certain Transfer Taxes*.

Pursuant to Bankruptcy Code section 1146: (a) the making or delivery of any instrument of transfer in connection with or furtherance of the Plan; (b) the issuance, transfer or exchange of any securities, instruments or documents pursuant to, in implementation of or as contemplated in the Plan; (c) the creation of any Lien, mortgage, deed of trust, or other security interest; (d) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan; and (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment, and any penalties, interest, or additions to any such tax, fee, assessment or other item identified above, to the fullest extent provided by law, including, but not limited to: (i) mortgage recording taxes imposed under Article 11 of the tax law of the State of New York, (ii) the New York Real Estate transfer tax imposed under Article 31 of the Tax Law of the State of New York (including by reason of a change in the equity ownership of the Debtor), (iii) the New York mansion tax imposed under Section 1402-a of the Tax Law of the State of New York exempted under Section 1405 of the Tax Law of the State of New York, (iv) the New York City Real Property transfer tax imposed by title 11, chapter 21 of the New York City Administrative Code (including by reason of a change in the equity ownership of the Debtor), and (v) any similar tax on the recording of deeds, transfers of property or ownership interests in property, recording of mortgages or other security instruments imposed by the State of New York, or any political subdivision thereof. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded (including, without limitation, the Register of the City of New York) shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax. All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Project, any taxes from which the

transactions effectuated pursuant to the Plan and Confirmation Order are exempt, pursuant to and in furtherance of Bankruptcy Code section 1146(a) and to the greatest extent provided by law. For the absence of doubt, all transactions under the Plan, including, without limitation, the transactions contemplated in section 5.1 of the Plan, and (a) the transfer of the Residential Units to the Secured Creditors or their designee on or after the Effective Date and any replacement mortgage on the Residential Units in connection with replacing current pledge of existing Secured Lender loans, (b) the transfer, if any, of the Retail Units to the Secured Creditors or their designee at the expiration of the Retail Closing Period and any replacement mortgage on Retail Units in connection with replacing current pledge of existing Secured Lender loans, and (c) the refinancing, if any of the Retail Units by the Debtors or their designee during the Retail Closing Period, shall be deemed made pursuant to and under the Plan and thus shall be entitled to the foregoing exemptions under section 1146(a) of the Bankruptcy Code.

5.      *Amendments*.

(a)      <u>Plan Modifications</u>. The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and subject to the consent of the Secured Creditors, to amend, modify, or supplement the Plan (i) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy Bankruptcy Code section 1129(b), and (ii) after entry of the Confirmation Order, in the manner provided for by Bankruptcy Code section 1127 or as otherwise permitted by law, in each case without additional disclosure pursuant to Bankruptcy Code section 1125. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)      <u>Other Amendments</u>. Before the Effective Date, the Debtors may in consultation with the Secured Creditors make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

6.      *Effectuating Documents and Further Transactions; Post-Effective Date Management*.

The Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Sheng Zhang shall continue to serve as Chairman and Chief Executive Officer of each of the Debtors on and after the Effective Date.

7.      *Revocation or Withdrawal of Plan; Reservation of Rights*.

(a)      The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Plan has been revoked or withdrawn prior to the Effective Date, or if

confirmation or the occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

(b)    Without limitation to the reservations set forth in section K.7(a), in the event the Plan is revoked or withdrawn and is deemed null and void, the Secured Creditors reserve all rights to object to any subsequent plan proposed by the Debtors or any other Person on any grounds and exercise any rights they otherwise have under the Bankruptcy Code or other governing law, notwithstanding any of the terms, provisions, or contents of the Plan.

8.    *Severability of Plan Provisions*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors shall have the power, subject to the consent of the Secured Creditors, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or further modified without the consent of the Debtors, and (c) nonseverable from the other terms and provisions of the Plan and mutually dependent therewith.

9.    *Post-Effective Date Condo Counsel*.

Upon Effective Date, Debtors to provide waiver for Secured Creditors to retain Holland & Knight as condo counsel in connection with sales of the Residential Units, Condominium operations and the Offering Plan, other than to pursue claims or causes of action against the Debtors or any affiliate of the Debtors.

10.    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or Entity governance matters relating to the Debtors, shall be governed by the laws of the state of incorporation or organization of the Debtors.

11.     *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns.

12.     *Successor and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

13.     *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which shall be deemed to become merged and integrated into the Plan.

14.     *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

## V.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

### A.    General

**THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.**

**THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE") TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN**

42

**EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW. NO RULING HAS BEEN REQUESTED FORM THE INTERNAL REVENUE SERVICE (THE "<u>IRS</u>") AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.**

This description does not cover all aspects of federal income taxation that may be relevant to the Debtors or holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to holders of Claims against the Debtors. This description also does not discuss the possible state tax or non-U.S. tax consequences that might apply to the Debtors or to holders of Claims.

**B.    <u>Consequences of Payment of Allowed Claims Pursuant to Plan Generally</u>**

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims will depend, among other things, on the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder's Claim is Allowed or Disputed on the Effective Date, and whether the holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim. All holders of Claims are urged to consult with their tax advisors concerning the tax consequences applicable under the Plan. Nothing contained herein shall be relied upon as tax advice.

1.    *Recognition of Gain or Loss*

In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount or premium. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized.

2.    *Bad Debt or Worthless Security Deduction*

A holder who receives in respect of an Allowed Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166 of the Internal Revenue Code. The rules governing the availability, character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which

a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

3.    *Receipt of Interest*

The Debtors cannot make any representations as to how the IRS will address the allocation of consideration between principal and interest under the Plan. In general, to the extent that any amount of consideration received by a holder is treated as received in satisfaction of unpaid interest that accrued during such holder's holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income and not otherwise exempt from U.S. federal income tax). Conversely, a holder may be allowed a bad debt deduction to the extent any accrued interest was previously included in its gross income but subsequently not paid in full. However, the IRS may take the position that any such loss must be characterized based on the character of the underlying obligation, such that the loss will be a capital loss if the underlying obligation is a capital asset. Again, holders of Allowed Claims should address all potential tax implications with their own tax advisors.

C.    **Additional Consequences to Direct or Indirect Equity Holders**

Implementation of the Plan will have additional U.S. federal income tax consequences to holders of Allowed Claims that are also direct or indirect equity holders of the Debtors as follows. The Debtors may recognize taxable income from various sources, including, but not limited to, income from discharge of indebtedness and sale or exchange gain. Because the Debtors are pass-through entities for federal income tax purposes, any such income will pass through to any direct equity holder and any indirect equity holder that owns its indirect interest solely through one or more entities that are pass-through entities. If any such direct or indirect equity holder is a "C" corporation for U.S. federal income tax purposes, such direct and indirect equity holder will be required to report its allocable share of such income and pay income taxes on such allocable share to the extent the holder is unable to offset such income with any available deductions and/or credits.

**VI.**
**CERTAIN RISK FACTORS TO BE CONSIDERED**

A.    **Certain Bankruptcy-Related Considerations**

1.    *Parties in Interest May Object to the Debtors' Classification of Claims*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class. The Debtors believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

44

2.    *Risk of Plan Not Being Confirmed*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that any negotiations regarding such modifications would not adversely affect the holders of Allowed Claims or that any such modifications would not necessitate the re-solicitation of votes.

3.    *Nonconsensual Confirmation*

As set forth above, in the event any impaired class of claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request pursuant to section 1129(b) of the Bankruptcy Code if at least one impaired class has accepted the plan (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes.

In the event that any Impaired Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to seek nonconsensual confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

4.    *Risks that Conditions to Effectiveness Will Not Be Satisfied*

Article IX of the Plan contains certain conditions precedent to the effectiveness of the Plan. There can be no assurances that the conditions contained in Article IX will be satisfied, and there are potential risks associated with patriating foreign funds as required to fund the Affiliate Capital Contribution.

5.    *Claims Objections/Reconciliation Process*

The Debtors reserve the right to object to the amount of any Claim, except as provided in the Plan. The estimates set forth herein cannot be relied on by any holder of a Claim whose Claim is subject to an objection.

## VII.
## VOTING PROCEDURES AND REQUIREMENTS

Pursuant to the Bankruptcy Code, a plan groups various claims into classes, each consisting of parties having similar legal rights in relation to a debtor. Each class may then be treated as either "impaired" or "unimpaired" under a plan. There are three ways in which a plan may leave a claim or interest "unimpaired." First, a plan may propose to not alter the legal, equitable or contractual rights of the holder of the claim or interest. Second, all defaults (excluding those covered by Section 365(b)(2) of the Bankruptcy Code) may be cured and the original terms of the obligation reinstated.

45

If a class is unimpaired, then it is conclusively presumed to vote in favor of a plan. An Impaired Class that would receive nothing under a plan is deemed to have rejected such a plan.

An Impaired Class that is proposed to receive any distribution has the right to vote, as a class, to accept or reject the plan. A Class of creditors accepts a plan if more than one-half (1/2) of the ballots that are timely received form members of such Class, representing at least two-thirds (2/3) of the dollar amount of Claims for which ballots are timely received, vote in favor of such plan. Section 1126(e) of the Bankruptcy Code provides that a creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the creditor's vote either to accept or reject a plan was not solicited or made in good faith, or in compliance with the Bankruptcy Code.

Each holder of an Allowed Claim in an Impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and shall indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

Holders of Claims in an Impaired Class entitled to vote will receive, together with this Disclosure Statement, a Ballot to be used in voting to accept or reject the Plan. Voting instructions will accompany the Ballot.

Each creditor should first carefully review this Disclosure Statement and the Plan. The Creditor should then complete the portions of the Ballot indicating the Class in which the creditor's Claim falls and the total dollar amount of the Claim. If the creditor's Claim falls into more than one Class, then the creditor should list each Class and state the dollar amount of the Claim which belongs in each Class. It is critical that the Class(es) and amounts of the Claim(s) be correctly stated on the Ballot, so that the creditor's vote can be properly counted.

Next, the creditor should mark in the space provided on the Ballot whether the creditor wishes to accept or to reject the Plan. Please be sure to fill in the name of the creditor for whom the Ballot is being filed. Finally, the Ballot must be signed by the creditor, or by an officer, partner, or other authorized agent of the creditor. Please note that the Debtors reserve the right to object to the allowance, designation of Class and/or allowable amount of any Claim set forth in a Ballot for purposes of voting and/or Distribution under the Plan.

Completed and signed Ballots should be returned by: (i) first class mail to the Debtors' counsel at the below address in the enclosed self-addressed return envelope; (ii) electronic mail at the addresses set forth below; or (iii) facsimile at the contact numbers set forth below:

**If by U.S. Postal Service Mail:**

Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
Attn: Robert D. Gordon
Attn: Rodger T. Quigley

**If by Electronic Mail:**

To lporetsky@herrick.com, with a reference to "Hudson 888
Owner LLC and Hudson 888 Holdco LLC" in the subject line, with
a carbon copy to rgordon@herrick.com and rquigley@herrick.com.

**If by Facsimile:**

To Robert D. Gordon at (212) 545-2312; and Rodger T. Quigley at
(212) 545-3373.

Completed Ballots should be returned as soon as possible, and, in any event so that they are <u>RECEIVED</u> NO LATER THAN **SEPTEMBER 22, 2024 AT 5:00 P.M**. ANY BALLOTS WHICH ARE RECEIVED BY THE DEBTORS AFTER THIS DEADLINE SHALL NOT BE COUNTED IN DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

**VIII.**
**CONFIRMATION OF PLAN**

In Order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtors disclose specified information concerning payments made or promised to insiders, and that the Plan comply with the applicable provisions of chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also requires that at least one Class of Claims has accepted the Plan ("<u>Minimum Voting Threshold</u>"), that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization, and that the Plan be fair and equitable with respect to each Class of Claims that is impaired under the Plan. The Bankruptcy Court can confirm the Plan if it finds that all of the requirements of section 1129(a) have been met. The Debtors believe that the Plan meets all of these required elements. With respect to the so-called "feasibility" test (*i.e.*, that the Plan is not likely to be followed by the need for further financial reorganization), the Debtors believe that they will be able to consummate the Plan fully and successfully without the need for further financial reorganization.

In order to confirm a plan over the dissenting vote of an impaired Class under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court, on request of the proponent of a plan, "shall" confirm the plan if the plan does not discriminate unfairly and is fair and equitable with

47

respect to each class of claims that is impaired under, and has not accepted, the plan. For purposes of section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" with respect to a class of unsecured creditors if, at a minimum, it satisfies the "absolute priority rule."

## A.    **Absolute Priority Rule**

To satisfy the absolute priority rule, the Plan must provide that the holder of any Claim that is junior to the Claims of the dissenting Class will not receive or retain under the Plan on account of such junior Claim any property unless the Claims of the dissenting Class are paid in full.

The Debtors believe that the Plan satisfies the absolute priority rule.

## B.    **Best Interest of Creditors Test; Liquidation Analysis**

Another requirement in order to confirm the Plan is that, pursuant to section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Voting class which has not voted to accept the Plan. Accordingly, if a voting class does not vote unanimously to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such voting Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens. If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to receive payment, which will include the fees and expenses of the trustee's professionals and the trustee's statutory fees. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Here, the Debtors believe that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available through a chapter 7 liquidation for the following reasons:

1.    The Chapter 11 Transfer Tax Exemption is Available Only in Chapter 11

Section 1146(a) of the Bankruptcy Code allows debtors, *in chapter 11 only*, to avoid paying stamp taxes or similar taxes on assets transferred pursuant to a confirmed chapter 11 plan of reorganization. Here, this transfer tax exemption, unavailable in a sale in a chapter 7 case, will result in significant proceeds to support the Debtors' successful reorganization.

48

2.      *Conversion to Chapter 7 Will Cause Additional Costs and Delay*

The hypothetical conversion of the Chapter 11 Cases to one under chapter 7 would: (a) result in additional fees and expenses; (b) cause a significant delay before distributions, if any, could be made to the holders of Allowed Claims or Interests; and (c) not maximize the value of the Project—all of which would be avoided if the Chapter 11 Cases remains in chapter 11 and the Plan is confirmed.

*First*, a conversion to chapter 7 would entail the appointment of a chapter 7 trustee who would retain his or her own professionals—attorneys, accountants, and perhaps brokers, for example—in order to properly discharge his or her duties and responsibilities. In other words, the appointment of a chapter 7 trustee will result in an additional layer of cost not otherwise present in chapter 11.

*Second*, in addition to increased fees and expenses, liquidating the Debtors' estates under chapter 7 will result in a significant delay considering because the chapter 7 trustee's newly retained professional(s) will need time to familiarize themselves with the Debtors' Cases and assets.

*Third*, in a chapter 7, the chapter 7 trustee would likely implement a bulk sale or fire-sale approach to the liquidation of the Debtors' assets, including the Project, designed not to maximize value but to expeditiously liquidate the Debtors' assets. A bulk sale of Fee Owner's assets will very likely result in a discounted purchase price and significantly less proceeds than realizing the going-concern value of the Project under the Plan. If this occurred, there would not be enough money to pay the Debtors' secured claims in Classes 1 and 2 in full, and it would thus be expected that holders of general unsecured claims in Class 4 would receive nothing in a chapter 7 liquidation.

Thus, in light of the foregoing, the Debtors believe the Plan satisfies the "best interests of creditors test," and, indeed, that the Plan is in the best interest of creditors.

# IX.
## ALTERNATIVES TO CONFIRMATION AND
## <u>CONSUMMATION OF THE PLAN</u>

If the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.

1.      *Alternative Plan*

With respect to an alternative plan, the Debtors have explored various alternative scenarios and believe that the Plan is the best vehicle to enable the holders of Claims to realize the maximum recovery under the circumstances.

2.      *Chapter 7 Liquidation*

(a)      As discussed above in Section VIII.B, the Debtors believe that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to holders

49

of Allowed Claims under the Plan will be greater than the recoveries expected to be available through a chapter 7 liquidation.

## X.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urges the holders of Allowed Claims in Classes 1, 2 3, and 4, and the holders of Allowed Interests in Class 5, to vote in favor of the Plan.

Dated: September 18, 2024

Respectfully submitted,

HUDSON 888 OWNER LLC AND HUDSON 888 HOLDCO LLC

By: */s/ Sheng Zhang*
Name: Sheng Zhang
Title: Chairman and Chief Executive Officer